STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. HARRY D. SUGAR, DEFENDANT-RESPONDENT.

Argued May 6, 1980—Decided July 24, 1980.

1

*Anthony J. Parrillo*, Deputy Attorney General, argued the cause for appellant (*John J. Degnan*, Attorney General of New Jersey, attorney; *Anthony J. Parrillo* and *James F. Flanagan, III*, Deputy Attorneys General, of counsel; *Anthony J. Parrillo, James J. Flanagan, III* and *James T. O'Halloran*, Deputy Attorneys General, on the brief).

*Jay H. Greenblatt* argued the cause for respondent (*Greenblatt & Greenblatt*, attorneys; *Jay H. Greenblatt, Franklin J. Riesenburger* and *Rocco J. Tedesco*, on the brief).

The opinion of the Court was delivered by

PASHMAN, J.

In this case a number of law enforcement officers intentionally eavesdropped on two conversations between a man suspected

of murder and his attorney. The man now stands charged with the murder and other related crimes. In advance of even an indictment, he seeks dismissal of the charges and the prohibition of any future prosecution. The question presented is whether the flagrantly illegal conduct of the officers irreparably impaired defendant's rights to the effective assistance of counsel and to a trial uncorrupted by public prejudice.

## I

### Facts

As a result of an investigation into the disappearance of one Joan Sugar, officers of the Vineland, New Jersey, police department arrested defendant Dr. Harry D. Sugar, her husband, as a material witness to her homicide, see *N.J.S.A.* 2A:162–2,[1] shortly after midnight on August 7, 1979. Defendant was immediately advised of his custodial rights as required by *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), and was taken to the Vineland Police headquarters, where he again received *Miranda* warnings. During interrogation by city detectives and a Cumberland County investigator, defendant asked that he be allowed to consult with counsel. He contacted Jay H. Greenblatt, a Vineland attorney. At about 2:40 a. m., Rocco J. Tedesco, an attorney associated with Greenblatt's firm, came to the police station to interview Sugar. After obtaining permission from one of the officers present, Tedesco conducted the interview in one of the interrogation rooms near the detective bureau's offices.

In the room used by Tedesco and Sugar was a concealed microphone that was part of an electronic communication system. It had been installed during construction of the police headquarters. It was normally employed for paging, communication between officers and monitoring interrogations. On the morning of August 7, 1979, however, it twice served the most extraordinary of purposes.

---

[1]This provision was specifically saved from repeal by the Code of Criminal Justice, *N.J.S.A.* 2C:1–1 *et seq.* See *N.J.S.A.* 2C:98–3.

Lieutenant Michael Joseph Tirelli of the Vineland police department was one of the officers who questioned Sugar before his attorney arrived. After Tedesco entered the interrogation room with defendant, Tirelli testified[2] that he went into his private office with Joseph Leon Soracco, Chief of Detectives in the Cumberland County Prosecutor's office. According to Tirelli, he remarked to Soracco that "it would be a good idea to know if we had a right guy or not." He then activated a monitor on his desk that was connected to the concealed microphone in the interrogation room. Tirelli and Soracco[3] listened to the conversation between Sugar and the attorney. While the record before us does not reveal the substance of the conversation,[4] Tirelli testified that he recorded at least a portion of what he overheard with a pocket tape recorder he kept in his desk. At the conclusion of the interview, Tedesco joined Tirelli and other officers for coffee and doughnuts and left police headquarters at about 3:00 a. m.

Later that morning, Tedesco returned with Greenblatt. The two lawyers received permission to use the same interrogation room to speak with defendant. After they began their discussion, Tirelli returned to his office. With Soracco and Lieutenant Guy Buscemi of the Vineland police present, he again activated the monitor, turned on his tape recorder, and listened to the conversation between defendant and his attorneys. During the conversation, Detective William L. Walters of the Vineland

---

[2]Tirelli testified under a judicial grant of immunity from prosecution based on his testimony. See *N.J.S.A.* 2A:81–17.2a1–17.2a2.

[3]Although Tirelli testified that Soracco was present, Soracco twice denied under oath that he even knew of this first incident of eavesdropping until later informed of it by an attorney from the State Division of Criminal Justice. Soracco also testified that he was not in Tirelli's private office during Tedesco's interview. However, Detective John Mazzeo of the Vineland police testified that Soracco was in Tirelli's office at that time. Both Soracco and Mazzeo testified under the same grant of immunity as granted to Tirelli. See *N.J.S.A.* 2A:81–17.2a1–17.2a2.

[4]Defendant has not based his application for dismissal of the charges pending against him on what was overheard in this initial interview.

police, who was preparing an affidavit for a warrant to search defendant's home, briefly entered and exited Tirelli's office.[5] Detective John Mazzeo, another Vineland officer, also entered the office during the eavesdropping. At Tirelli's direction, Mazzeo took notes of the attorneys' interview.

The record contains a transcript of the tape Tirelli made of this second conversation. We decline to describe the discussion in detail. Our present concern is the outrageous character of the illegal eavesdropping. However, it is important to note that during the conversation Greenblatt made three statements reflecting an awareness of possible decisions about trial strategy.

Before the conclusion of the interview, Tirelli shut off the monitor and tape recorder. He then instructed Mazzeo to prepare criminal complaints against defendant. Tirelli also summarized the eavesdropped conversation for Walters, who together with Mazzeo drafted affidavits in support of a search warrant.

After obtaining a warrant, Tirelli led several Vineland officers on a search of defendant's home. Tedesco accompanied them. He later remarked to Greenblatt that the police had demonstrated an uncanny ability to locate what they were seeking quickly. While the search was being conducted, Soracco contacted his superior, William H. Doherty, Cumberland County Prosecutor. Soracco informed Doherty of the illegal eavesdropping. Soon afterwards, about noon on August 7, the prosecutor arrived at police headquarters, and Tirelli returned from his search of the Sugar residence. Greenblatt then met with Doherty, Soracco and Tirelli in the latter's office. The attorney was informed that formal charges were being filed against defendant in Vineland Municipal Court. During the discussion, both Doherty and Tirelli advised Greenblatt to have his client plead guilty to the pending charges. No one—not Prosecutor Doherty, not Chief Investigator Soracco, not Lieutenant Tirelli—revealed to Greenblatt that the substance of his interview with

---

[5]Under a grant of immunity, Walters testified he was unable to identify the voices he heard on the monitor or to recall what they were saying.

defendant was now common knowledge at the Vineland detective bureau.

The Vineland police obtained and executed additional search warrants during the next few days. Greenblatt soon harbored strong suspicions that his conversation with defendant had been overheard. An anonymous telephone call confirmed these suspicions. Greenblatt accordingly sought the advice of the Assignment Judge for Cumberland County, the Hon. George B. Francis. Judge Francis recommended he contact the State Division of Criminal Justice. Greenblatt did so on August 10, 1979. According to the record, this is the first time State officials were informed of any illegal eavesdropping.

When members of the State's Corruption Investigation Section confirmed that eavesdropping had occurred, the Attorney General removed the Vineland Police Department and the Cumberland County Prosecutor's office from the case and assumed the investigation and prosecution directly. See *N.J.S.A.* 52:17B–107, –108. The State Division of Criminal Justice then devised a scheme to assure the exclusion of tainted evidence gathered after the eavesdropping from a subsequent trial. A group of attorneys and investigators was assigned to continue the investigation into the illegal surveillance and to determine what information had been obtained independently from it. A second group would commence its own investigation based on any "untainted" evidence, present the case to a grand jury, and conduct the prosecution at any eventual trial.

The State's scheme contained elaborate precautions to prevent the "untainted" prosecuting team from learning of any illegally acquired information. The other investigative team took custody and controlled distribution of all files and reports prepared by the Vineland police concerning the disappearance and death of defendant's wife. Members of that team were instructed not to discuss the case with any one, particularly any member of the group which would prosecute defendant. The prosecuting team was not told why the Attorney General had superseded the county prosecutor. Members of that team instructed the subjects of their interviews to answer only questions put to them

and not to volunteer information. This procedure was adopted to prevent the prosecution team from learning of the illegal eavesdropping indirectly.

Despite the efforts of the State to prevent dissemination of what the Vineland police had learned, accounts of illegal electronic surveillance appeared in two newspapers in South Jersey. In Vineland itself detailed descriptions of defendant's conversations circulated with other rumors about Joan Sugar's death.

## II

### The Motion to Dismiss

On August 22, 1979, defendant filed a notice of motion for dismissal of the municipal court complaints in the Superior Court, Law Division, Cumberland County. Defendant presented supporting affidavits to Judge Francis in chambers on August 27. The court also received an oral representation by the State regarding the eavesdropping and its aftermath; it then sealed the record and continued the matter without decision. After oral argument on the motion on August 31, the trial court ruled that the eavesdropping had occurred and was in violation of the Sixth Amendment of the federal Constitution. The court reserved its decision on the appropriate remedy, and ordered a plenary hearing on the extent to which the conversations between defendant and his attorneys had been publicly disseminated.

The court held the hearing on a remedy over seven days in October 1979. In a written opinion dated December 5, 1979, Judge Francis held that dismissal of the charges was the only appropriate remedy. Finding a "gross" intrusion into the attorney-client relationship, the court ruled that a showing of prejudice was not necessary to establish a denial of the effective assistance of counsel. The eavesdropping therefore violated the Sixth Amendment of the federal Constitution and Article I, paragraph 10 of the New Jersey Constitution.

The court next addressed the proper remedy for this constitutional violation. It required

that the State show beyond a reasonable doubt that the confidential information disclosed by defendant to his attorneys had not become part of the public domain, impairing his right to obtain a fair trial. [citations omitted]

In determining whether the State had met this burden, the trial court did not assess the efficacy of the State's scheme to maintain an "untainted" group of prosecutors. It did not consider whether that group possessed illegally gained knowledge which could compromise defense counsel's ability to provide effective representation. Instead, the court focused on public dissemination of the confidential information, which would create prejudice in prospective jurors and prosecution witnesses. Because of the extensive evidence regarding public disclosure in the record, the court found the State had failed to prove that confidential information was not in the public domain.[6] Accordingly, it dismissed the criminal complaints and enjoined the State from undertaking any future prosecution of defendant for his wife's death.

To prevent further disclosure from frustrating the State's efforts in pursuing an appeal, Judge Francis retained custody of all trial exhibits and sealed his opinion and accompanying order. He also continued defendant's bail and stayed its order to permit the State to conduct further investigation. However, the State was still enjoined from presenting evidence to a grand jury.

On December 14, 1979, the State filed a notice of appeal to the Superior Court, Appellate Division. The notice was impounded. Defendant then sought to unseal the trial court's order of dismissal and to be released from bail. The State opposed defendant's motion. It also cross-moved to vacate the prohibition of grand jury proceedings, and to unseal its notice of appeal and the trial court's order permitting further investigation. Deciding these motions on January 27, 1980, the Appellate Division ordered that the trial court's order of dismissal and the State's notice of appeal be unsealed. It also ordered defendant

---

[6]Although the court based this finding on the premise that the State had to show the absence of public dissemination beyond a reasonable doubt, it added that its decision would be the same if the State's burden was only that of a "clear and convincing" demonstration.

released from bail. The court denied the State's other requests for relief.

Upon the State's application, Justice Sullivan granted an emergent stay of the Appellate Division's order, see *R.* 2:9–8, to permit review of the State's motions for a stay and for leave to appeal that order. On February 13, 1980, we granted the State leave to appeal, modified the Appellate Division's order to permit presentation by the State to a grand jury short of an indictment, and affirmed the order as modified. We also vacated the emergent stay and dismissed the State's application to the entire Court for a stay as moot.

After this round of interlocutory motions, the State petitioned this Court for direct certification of the matter pending unheard in the Appellate Division. *R.* 2:12–1. We granted the petition on April 10, 1980.[7] We now reverse the trial court's order of dismissal.

## III

### The Illegal Eavesdropping

Defendant essentially raises two claims arising under both the Sixth Amendment of the United States Constitution[8] and Article I, paragraph 10 of the New Jersey Constitution.[9] One

---

[7]After we denied the State's motion to hold oral argument *in camera*, both parties waived argument before us in open court. We respected the strong desires embodied in the waivers. Accordingly, we have considered the matter on the basis of the trial record and the briefs before the Appellate Division, all of which that court had impounded, and supplemental memoranda filed in this Court.

[8]The Sixth Amendment provides in pertinent part:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by any impartial jury of the State and district wherein the crime shall have been committed, * * * and to have the Assistance of Counsel for his defence.

[9]The pertinent language is nearly identical to that of the federal Constitution:

In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury * * * and to have the assistance of counsel in his defense.

ground for dismissal is that the eavesdropping impaired defense counsel's ability to provide constitutionally effective assistance. Defendant's other contention is that the extensive publicity given his overheard statements has prejudiced potential jurors and witnesses against his innocence, thus making a fair trial impossible. Before we address these claims, we devote our attention directly to the illegal conduct that forms the basis for defendant's application.

We are outraged. We are compelled to say exactly that. Any court, but particularly the highest Court of this State, does more than apply settled principles of social order. A court affirms those values emerging from the conflict between the ideals of liberty and democracy, between individual rights and public responsibilities. There are others to give strong voice against violence to person and property, to proclaim social needs and to promote economic welfare. But there are few to deplore the deprivation of an individual's liberty, and none other so clothed in the moral traditions of the rule of law. We must therefore depart briefly from formal legal analysis to express and explain our dismay.

If the rule of law is this nation's secular faith, then the members of the Bar are its ministers. A lawyer is the mediator between his client's desires and the sovereign's commands. His aid is sought because of the relative ignorance of those to whom the law is but a collection of dim mysteries. When confronted with the awesome power of the criminal process, a client is never more in need of professional guidance and advocacy. In this setting, an instinct for survival compels a defendant to confide in an attorney.[10] The necessity of full and open disclo-

---

[10]Because of this, courts have viewed with suspicion an ostensible waiver by a defendant of the right to representation by counsel. See, e. g., *Brewer v. Williams*, 430 *U.S.* 387, 404, 97 *S.Ct.* 1232, 1242, 51 *L.Ed.*2d 424 (1977); *Johnson v. Zerbst*, 304 *U.S.* 458, 464–465, 58 *S.Ct.* 1019, 1023, 82 *L.Ed.* 1461 (1938); *People v. Siegenthaler*, 7 *Cal.*3d 465, 471, 499 *P.2d* 499, 503, 103 *Cal.Rptr.* 243, 247 (Sup.Ct. 1972); *State v. Bellucci*, 81 *N.J.* 531, 544 (1980); *People v. Hobson*, 39 *N.Y.*2d 479, 484, 348 *N.E.2d* 894, 898, 384 *N.Y.S.*2d 419, 422 (Ct.App. 1976).

sure by a defendant, see American Bar Ass'n., *Code of Professional Responsibility, EC* 4–1 at 21C (1976), imbues that disclosure with an intimacy equal to that of the confessional, and approaching even that of the marital bedroom. *Cf. Griswold v. Connecticut*, 381 *U.S.* 479, 484–486, 85 *S.Ct.* 1678, 1681–1682, 14 *L.Ed.*2d 510 (1965).

■ Any interference with the intimate relationship between attorney and client may do profound violence to the individual privacy of the client. Instead of receiving the protection that counsel can provide, the client unwittingly reveals his innermost thoughts to the unscrupulous. Such an invasion is unconscionable. The privacy between attorney and client is but an extension of the client's personal privacy. While generally there is no reasonable expectation that a party to a private conversation will not disclose to the government what he has learned, see *Hoffa v. United States*, 385 *U.S.* 293, 302–303, 87 *S.Ct.* 408, 413–414, 17 *L.Ed.*2d 374 (1966); see also *United States v. White*, 401 *U.S.* 745, 749, 91 *S.Ct.* 1122, 1124, 28 *L.Ed.*2d 453 (1971) (plurality opinion), the lawyer's duty to respect confidences is beyond dispute, see *DR* 4–101, and receives zealous enforcement, see, *e. g., State v. Bellucci*, 81 *N.J.* 531, 543 (1980); *State v. Land*, 73 *N.J.* 24, 35 (1977). Even in the courtroom, where the search for truth is of singular importance, an evidentiary privilege surrounds those confidences. Only the client may waive that protection. See, *e. g., In re Selser*, 15 *N.J.* 393, 404 (1954); *Evid.R.* 26(b); see also *Esposito v. United States*, 436 *F.*2d 603, 606 (9th Cir. 1970); *Republic Gear Co. v. Borg-Warner Corp.* , 381 *F.*2d 551, 556 (2d Cir. 1967); 8 J. Wigmore, *Evidence* § 2327 at 634–635 (McNaughton rev. 1961). The fundamental need for secrecy between attorney and client is clear. The intentional invasion of that privacy is just as clearly violative of basic notions of procedural justice.

The type of activity revealed by the record before us may be more than unlawful—it may also be criminal. Under both State and federal law, the willful interception of oral communications by electronic means, if not specifically permitted, is punishable by a fine of not more than $10,000, imprisonment of not more

than five years, or both. 18 *U.S.C.A.* § 2511(1)(a); *N.J.S.A.* 2A:156A–3a. The disclosure or use of illegally intercepted communications is subject to the same punishment. 18 *U.S.C.A.* § 2511(1)(c), (d); *N.J.S.A.* 2A:156A–3b, c; see also *United States v. Duncan*, 598 *F.*2d 839, 847 (4th Cir. 1979), *cert.* den., 444 *U.S.* 871, 100 *S.Ct.* 148, 62 *L.Ed.*2d 96 (1979); *United States v. McIntyre*, 582 *F.*2d 1221, 1224–1225 (9th Cir. 1978); *Kratz v. Kratz*, 477 *F.Supp.* 463, 477–480 (E.D.Pa. 1979); *State v. McCartin*, 135 *N.J.Super.* 81 (Law Div. 1975). While under both statutes law enforcement officials enjoy a qualified immunity from prosecution, the statutes provide it only in an emergency involving national security or organized crime, 18 *U.S.C.A.* § 2518(7); *N.J.S.A.* 2A:156A–13, or where there is good faith reliance on the authorization of a court, 18 *U.S.C.A.* § 2520; *N.J.S.A.* 2A:156A–25. There is also the possibility of criminal liability for misconduct in office, see *State v. Begyn*, 34 *N.J.* 35, 48–51 (1961); *State v. Furey*, 128 *N.J.Super.* 12, 17–18 (App.Div. 1974); *State v. Silverstein*, 76 *N.J.Super.* 536, 540–541 (App.Div. 1962), aff'd, 41 *N.J.* 203 (1963); *N.J.S.A.* 2A:85–1 (1969); see also *N.J.S.A.* 2C:30–2; *N.J.S.A.* 2C:1–1(e), and for violation of federal civil rights and conspiracy statutes, see 18 *U.S.C.A.* §§ 241, 371. Of course, we cannot and do not consider whether any law enforcement officials have committed a crime. But it is important to note the existence of a number of criminal statutes which can apply to illegal eavesdropping, for they highlight the egregious character of the particular conduct that the record before us reveals.

The fact that the individuals responsible for invading defendant's privacy are law enforcement officials heightens our concern and sparks our sense of outrage. It is a "fundamental precept that courts may not abide illegality committed by the guardians of the law." *State .v. Molnar*, 81 *N.J.* 475, 484 (1980). This mandate raises the question whether "fundamental fairness" requires dismissal of the prosecution, even absent a violation of the Sixth Amendment. That doctrine prohibits conduct by law enforcement officials that perverts the judicial process and turns it into a prosecutorial tool. "To allow such conduct

would erode public confidence in the impartiality and fairness of the judicial process." *Molnar, supra,* 81 *N.J.* at 485; see *State v. Redinger,* 64 *N.J.* 41, 50 (1973). Because our concern for judicial integrity extends even to its mere appearance, we have employed the notion of fundamental fairness to strike down official action that does not itself violate due process of law. See *Molnar, supra,* 81 *N.J.* at 484–486.

■ Fundamental fairness on occasion requires that a court prohibit conduct that does not transgress the Constitution. The doctrine is directed at both judicial integrity and the actions of other officials which may impugn that integrity. Further incidents of official eavesdropping on attorney-client relationships might create the appearance of tacit judicial complicity if any resulting prosecution were not prohibited. If it becomes clear that such eavesdropping is not an isolated occurrence, any indictment founded upon this surveillance shall be dismissed. Fundamental fairness would require this to eliminate the risk of apparent judicial tolerance and to deter more effectively the illegal practices themselves. We perceive no threat here, however, to the integrity of the judicial process from this single incident of lawless conduct. If the prosecution the State seeks is carefully purged of all taint from investigatory excess, fundamental fairness would not compel its prohibition.

Since the taint arising from the officers' unconscionable conduct is constitutional in nature, we turn to defendant's constitutional claims to determine whether an untainted prosecution is possible. We first consider the assertion that defendant has been denied the effective assistance of counsel.

## IV

### Effective Assistance of Counsel

■ The Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution establish a defendant's right to the assistance of counsel in

criminal prosecutions.[11]  Those guarantees recognize the obvious but important truth that "the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty * * *." *Johnson v. Zerbst,* 304 *U.S.* 458, 462–463, 58 *S.Ct.* 1019, 1022, 82 *L. Ed.* 1461, (1938); see *Rodriguez v. Rosenblatt,* 58 *N.J.* 281, 295 (1971).  Without the guiding hand of counsel, an innocent defendant may lose his freedom because he does not know how to establish his innocence.  *Powell v. Alabama,* 287 *U.S.* 45, 69, 53 *S.Ct.* 55, 64, 77 *L.Ed.* 158 (1932);  see *Argersinger v. Hamlin,* 407 *U.S.* 25, 31, 92 *S.Ct.* 2006, 2009, 32 *L.Ed.*2d 530 (1972).  Trained counsel is also necessary to vindicate fundamental rights that receive protection from rules of procedure and exclusionary principles. See *State v. McCombs,* 81 *N.J.* 373 (1979);  *State v. Stein,* 70 *N.J.* 369, 384 (1976).  Where the doctrine supporting those rights "has any complexities the untrained defendant is in no position to defend himself * * *."  *Rodriguez, supra,* 58 *N.J.* at 295. Because the assistance of counsel is essential to insuring fairness and due process in criminal prosecutions, a convicted defendant may not be imprisoned unless counsel was available to him at every "critical" point following "the initiation of adversary judicial criminal proceedings," *Kirby v. Illinois,* 406 *U.S.* 682, 689, 92 *S.Ct.* 1877, 1882, 32 *L.Ed.*2d 411 (1972).  See, e. g., *Scott v. Illinois,* 440 *U.S.* 367, 99 *S.Ct.* 1158, 59 *L.Ed.*2d 383 (1979); *Moore v. Illinois,* 434 *U.S.* 220, 98 *S.Ct.* 458, 54 *L.Ed.*2d 424 (1977); *Argersinger v. Hamlin, supra; United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967); *Massiah v. United States,* 377 *U.S.* 201, 84 *S.Ct.* 1199, 12 *L.Ed.*2d 246 (1964); *Douglas v. California,* 372 *U.S.* 353, 83 *S.Ct.* 814, 9 *L.Ed.*2d 811 (1963); *Gideon v. Wainwright, supra*;  see also *State v. McCombs, supra; State v. Farrow,* 61 *N.J.* 434, 446–447 (1972), *cert.* den., 410 *U.S.* 937, 93 *S.Ct.* 1396, 35 *L.Ed.*2d 602 (1973); *State v. Vogel,* 45 *N.J.* 400, 404–405 (1965).

---

[11]The federal Constitution's guarantee applies to state criminal prosecutions by virtue of the Due Process Clause of the Fourteenth Amendment. *E. g., Argersinger v. Hamlin,* 407 *U.S.* 25, 92 *S.Ct.* 2006, 32 *L.Ed.*2d 530 (1972); *Gideon v. Wainwright,* 372 *U.S.* 335, 83 *S.Ct.* 792, 9 *L.Ed.*2d 799 (1963).

■ Because the Constitution requires the assistance of counsel and not merely his physical presence, counsel must be effective as well as available. *Cuyler v. Sullivan,* 446 U.S. 335, 344–345, 100 *S.Ct.* 1708, 1716, 64 *L.Ed.2d* 333, 343–344 (1980); *Tollett v. Henderson,* 411 *U.S.* 258, 266–267, 93 *S.Ct.* 1602, 1607–1608, 36 *L.Ed.2d* 235 (1973); *McMann v. Richardson,* 397 *U.S.* 759, 771 n.14, 90 *S.Ct.* 1441, 1449 n.14, 25 *L.Ed.2d* 763 (1970); *Bellucci,* 81 *N.J.* at 538; *State v. Mingo,* 77 *N.J.* 576, 581 (1978); *State v. Land,* 73 *N.J.* 24 (1977). The right to counsel would be an empty assurance if a formal appearance by an attorney were sufficient to satisfy it. *Avery v. Alabama,* 308 *U.S.* 444, 446, 60 *S.Ct.* 321, 322, 84 *L.Ed.* 377 (1940); see *Cuyler v. Sullivan, supra,* 446 *U.S.* at 344–345, 100 *S.Ct.* at 1716, 64 *L.Ed.2d* at 344; *Bellucci, supra,* 81 *N.J.* at 538. The circumstances under which a lawyer provides counsel must not "preclude the giving of effective aid in the preparation and trial of the case." *Powell v. Alabama,* 287 *U.S.* 45, 71, 53 *S.Ct.* 55, 65, 77 *L.Ed.* 158 (1932). "A defense attorney's representation must be 'untrammeled and unimpaired' * * *." *Bellucci, supra,* 81 *N.J.* at 538; see *Glasser v. United States,* 315 *U.S.* 60, 70, 62 *S.Ct.* 457, 465, 86 *L.Ed.2d* 680 (1942); *Land, supra,* 73 *N.J.* at 31. If counsel is not "reasonably competent," *Cuyler v. Sullivan, supra,* 446 *U.S.* at 344, 100 *S.Ct.* at 1716, 64 *L.Ed.2d* at 344; see *McMann, supra,* 397 *U.S.* at 770–771, 90 *S.Ct.* at 1448–1449, 25 *L.Ed.2d* at 773, or if counsel's ability to be a vigorous partisan has been curtailed, *Bellucci, supra,* 81 *N.J.* at 540–541; *Land, supra,* 73 *N.J.* at 30, then the assistance provided is not constitutionally adequate.

■ Defendant contends that the illegal eavesdropping has irreparably compromised his attorney's ability to be an effective advocate. There are two possible ways in which this could occur. The first is that official knowledge of the contents of the overheard conversation would prevent defendant's counsel from constructing and presenting an adequate defense. The second potential source of impairment arises from public knowledge of the interview between defendant and his attorneys. The resulting prejudice could prevent defense counsel from obtaining

information through investigation of the alleged victim's death. Although the ability to conduct an investigation may be a crucial part of the effective assistance that counsel should provide, see *United States v. DeCoster*, 159 *U.S.App.D.C.* 326, 333, 487 *F*.2d 1197, 1204 (D.C.Cir. 1973); *Coles v. Peyton*, 389 *F.* 2d 224, 226 (4th Cir. 1968), *cert.* den., 393 *U.S.* 849, 89 *S.Ct.* 80, 21 *L.Ed.*2d 120 (1968); see also American Bar Ass'n., Project on Standards for Criminal Justice, *The Defense Function* § 4.1 (1971), defendant has not asserted that he would be unable to conduct an adequate investigation because of the publicity surrounding his trial. We therefore need consider only whether defendant will be deprived of effective assistance of counsel because of what law enforcement officials learned by illegal surveillance.

Initially we observe that much of what was overheard by the Vineland police consisted of statements made by defendant— sometimes in response to specific questions by counsel, sometimes as part of a continuing narrative. The interception of these statements raises the question whether the police violated constitutional prohibitions against illegal searches and seizure, *U.S.Const.* Amend. IV; *N.J.Const.* (1947) Art. I, par. 7. The trial court reserved that issue for a motion to suppress if defendant was later indicted, see *N.J.S.A.* 2A:156A–21; *R.* 3:5– 7. We do not consider it here. The question presently arising under the Sixth Amendment is whether any exclusionary remedy under search and seizure principles would adequately protect his right to counsel. If it would not, dismissal of the prosecution might be required.

Not every intrusion into the attorney-client relationship results in a denial of the right to effective assistance of counsel. See *Weatherford v. Bursey*, 429 *U.S.* 545, 558, 97 *S.Ct.* 837, 845, 51 *L.Ed.*2d 30 (1977). The value of counsel to a criminal defendant depends in part on his skill in formulating trial strategy. This in turn requires that counsel enjoy the absolute trust and confidence of his client, since an effective defense will follow only when a defendant has made full and frank disclosure of his knowledge of events surrounding the

alleged crime. Any interference with the relationship of trust between attorney and client may destroy counsel's effectiveness. Likewise, any disclosure of counsel's trial strategy puts the defense at an immeasurable disadvantage. An accusatorial system of criminal justice requires that defense counsel's strategic discussions take place in secret. Premature disclosure of trial strategy upsets the presumed balance of advocacy that lies at the heart of a fair trial. In either case official intrusion would prevent defense counsel from providing constitutionally effective assistance. Because these more egregious violations do not involve the disclosure of evidence, an exclusionary remedy would be insufficient to vindicate defendant's right, deter official misconduct or maintain judicial integrity. A dismissal of the prosecution would thus be necessary as the only means to avoid the denial of one of the fundamental requirements of due process of law.

The various approaches toward intrusions upon attorney-client confidences which courts have adopted are substantially consistent with this analysis. In *Weatherford v. Bursey, supra,* the United States Supreme Court rejected a categorical rule which would have found a violation of the Sixth Amendment in every intrusion into consultations between criminal defendants and their attorneys. The *Weatherford* Court refused to adopt the approach of two earlier cases in the Court of Appeals for the District of Columbia Circuit, *Caldwell v. United States,* 92 *U.S.App.D.C.* 355, 205 *F.*2d 879 (1953); *Coplon v. United States,* 89 *U.S.App.D.C.* 103, 191 *F.*2d 749 (1951), that any interception of a communication between a defendant and his lawyer was cause for reversal of a conviction. *Weatherford, supra,* 429 *U.S.* at 553–554, 97 *S.Ct.* at 842–843, 51 *L.Ed.*2d at 38–39. The Court noted that its own earlier cases involving surveillance of an attorney's consultations were concerned with the use at trial of illegally obtained evidence. *Id.* at 551–552, 97 *S.Ct.* at 841–842, 51 *L.Ed.*2d at 37–38, see *O'Brien v. Black v. United States,* 385 *U.S.* 26, 87 *S.Ct.* 190, 17 *L.Ed.*2d 26 (1966). According to the Court, either a disclosure of defense strategy or an inhibition of free exchange between attorney and

client would present a stronger case of unconstitutional conduct. *Weatherford, supra,* 429 *U.S.* at 554 n.4, 557–558, 97 *S.Ct.* at 843 n.4, 844–845, 51 *L.Ed.*2d at 39 n.4, 40–44. Without either occurring, and without the use at trial of illegally derived evidence, the Court found no Sixth Amendment violation.[12]

Other courts have similarly refused to order the dismissal of a prosecution where illegal surveillance has not disclosed trial strategy and has not impaired the defendant's confidential relationship. *E. g., United States v. Kilrain* 566 *F.*2d 979, 982–983 (5th Cir. 1978), *cert.* den., 439 *U.S.* 819, 99 *S.Ct.* 80, 58 *L.Ed.*2d 109 (1978); *United States v. Valencia,* 541 *F.*2d 618, 622–624 (6th Cir. 1976); *United States v. Dodge,* 538 *F.*2d 770, 777–779 (8th Cir. 1976), *cert.* den., 429 *U.S.* 1099, 97 *S.Ct.* 1118, 1119, 51 *L.Ed.* 2d 547 (1977); *United States v. Scott,* 521 *F.*2d 1188 (9th Cir. 1975), *cert.* den., 424 *U.S.* 955, 96 *S.Ct.* 1431, 47 *L.Ed.*2d 361 (1976); *United States v. Gartner,* 518 *F.*2d 633 (2d Cir. 1975), *cert.* den., 423 *U.S.* 915, 96 *S.Ct.* 222, 46 *L.Ed.*2d 144 (1975); *United States v. Rispo,* 460 *F.*2d 965 (3d Cir. 1972); *Taglianetti v. United States,* 398 *F.*2d 558 (1st Cir. 1968), aff'd, 394 *U.S.* 316, 89 *S.Ct.* 1099, 22 *L.Ed.*2d 302 (1969). The only cases resulting in dismissal of the prosecution have involved the disclosure of trial strategy, *United States v. Levy,* 577 *F.*2d 200 (3d Cir. 1978); *United States v. Peters,* 468 *F.Supp.* 364 (S.D.Fla. 1979); *United States v. Orman,* 417 *F.Supp.* 1126 (D.Colo. 1976); *Barber v. Municipal Court,* 24 *Cal.*3d 742, 598 *P.*2d 818, 157 *Cal.Rptr.* 658 (1979); *State v. Cory,* 62 *Wash.*2d 371, 377, 382 *P.*2d 1019, 1023 (1963), or interference with the ability of a defendant to place trust and confidence in his attorney, *United States v. Morrison,* 602 *F.*2d 529, 533 (3d Cir. 1979), *cert.* granted, —— *U.S.* ——, 100 *S.Ct.* 3048, 65 *L.Ed.*2d 1135 (1980); *Barber v. Municipal*

---

[12]The Court also noted that the particular intrusion in *Weatherford* was not intentional. See 429 *U.S.* at 558, 97 *S.Ct.* at 845, 51 *L.Ed.*2d at 41. In view of its approval of *O'Brien* and *Black,* both of which concerned intentional violations but recognized the possibility of a second trial, see *Black,* 385 *U.S.* at 29, 87 *S.Ct.* at 192, 17 *L.Ed.*2d at 29; cf. *O'Brien, supra* (*per curiam* order of reversal merely citing *Black*), we do not believe the *Weatherford* Court found an intrusion to violate the Sixth Amendment simply because it was intentional.

*Court, supra,* 24 *Cal.*3d at 750–751, 756, 598 *P.*2d at 821–822, 826, 157 *Cal.Rptr.* at 661–662, 666.[13] Thus there appears to be agreement that dismissal of a prosecution is the appropriate remedy for official intrusion upon attorney-client relationships only where it destroys that relationship or reveals defendant's trial strategy.

In this case defendant does not claim that his ability to work in confidence with his attorney has been impaired, nor has counsel claimed that he has lost defendant's trust. The remaining inquiry, therefore, to determine the propriety of the trial court's order of dismissal is whether the overheard conversations between defendant and his attorney involved matters of trial strategy. The State asserts, however, that regardless of any disclosure of trial strategy, the procedures it has implemented to insure an insulated, untainted prosecution team prevents that disclosure from prejudicing defendant. We are highly skeptical of its claims.

We are not dealing with a case where an outside informer has disclosed his knowledge of confidential communications to the government. *Cf. United States v. Henry,* 447 *U.S.* 264, 100 *S.Ct.* 2183, 65 *L.Ed.*2d 115 (1980); *Weatherford, supra,* 429 *U.S.* at 556, 97 *S.Ct.* at 844, 51 *L.Ed.*2d at 40. In the present case, those who performed the illegal surveillance are part of the government. To accept the State's contention that it has diverted the flow of illicit information away from a group of prosecutors, we would be required to engage in groundless speculation. We could not, of course, ask the assertedly "untainted" prosecutors what they do not know about this case and obtain a useful answer. To inquire whether they had learned of the illicitly acquired admissions would run the risk of informing them indirectly. Thus, any examination of the adequacy of the State's procedures must confine itself to questioning of those already in possession of

---

[13]Neither *Caldwell* or *Coplon,* the two District of Columbia Circuit cases criticized by the Supreme Court in *Weatherford,* involved a dismissal of a prosecution. See *Caldwell, supra,* 92 *U.S.App.D.C.* at 358, 205 *F.*2d at 882; *Coplon, supra,* 89 *U.S.App.D.C.* at 114, 191 *F.*2d at 760.

"tainted" information. Yet after learning of the elaborate procedures for preventing further disclosure—even if we accept every description of those procedures as credible and accurate—we would still be left to speculate about their success. No court would be able to conclude beyond a reasonable doubt, see, *e. g., Moore v. Illinois*, 434 *U.S.* 220, 232, 98 *S.Ct.* 458, 466, 54 *L.Ed.2d* 424 (1977); *Chapman v. California,*.386 *U.S.* 18, 87 *S.Ct.* 824, 17 *L.Ed.2d* 705 (1967), that the State had built a solid wall of ignorance around a group of its employees. While the State's procedures demonstrate the good faith of its supervisory officers, and while those procedures may be useful in demonstrating that the evidence to be used at trial is free from any taint, see, *e. g., Brewer v. Williams*, 430 *U.S.* 387, 406 n.12, 97 *S.Ct.* 1232, 1243 n.12, 51 *L.Ed.2d* 424 (1977); *State v. Hodgson*, 44 *N.J.* 151, 156–157 (1965), cert. den., 384 *U.S.* 1021, 86 *S.Ct.* 1929, 16 *L.Ed. 2d* 1022 (1966); *State v. Fenin*, 154 *N.J.Super.* 282 (App.Div. 1977); *State v. Mather*, 147 *N.J.Super.* 522 (Law Div. 1977), they may ·not transform any knowledge of trial strategy by certain State officials into a harmless infringement of defendant's Sixth Amendment rights.

Defendant asserts that he and his attorney discussed matters of trial strategy during their second interview. If this contention were correct, dismissal of the prosecution would be required. However, even accepting defendant's assertions about what was discussed, and having examined the transcript of the recorded conversation, we do not agree that there was a revelation of trial strategy. While two of Greenblatt's statements reflect an awareness of possible defenses, neither amounts to a strategic decision and thus cannot be used by the State to defendant's detriment. The third statement related only to Greenblatt's ethical responsibilities as an attorney.

Since it does not presently appear that any of the statements cited by defendant amounts to a disclosure of trail strategy, we find no cause at this juncture for the drastic remedy of dismissal of the prosecution. The remaining issue for determining whether defendant may be prosecuted concerns possible prejudice resulting from public disclosure of defendant's statements.

# V

## *Prejudicial Publicity*

After hearing testimony regarding the publicity attending defendant's conversations, the trial court held that the State had not met its burden of showing beyond a reasonable doubt that the illegally acquired information was not "in the public domain." The court then implied that both potential jurors and witnesses would be prejudiced against defendant. This public prejudice, according to the court, would make a fair trial impossible.

While we agree with the trial court that there was extensive publicity about defendant's statements in the area surrounding Vineland, there is no evidence regarding publicity in other parts of the State. As long as the trial court's notion of "the public domain" extends at its furthest to the southern portion of the State, its conclusion is supported by substantial credible evidence. Yet this does not vitiate the possibility of an impartial jury. While the constitutional standard for a fair trial requires "a panel of impartial, 'indifferent' jurors," *Irvin v. Dowd*, 366 *U.S.* 717, 722, 81 *S.Ct.* 1639, 1642, 6 *L.Ed.2d* 751 (1961), the jurors actually empanelled need not be ignorant of the facts of the case.

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. [*Dobbert v. Florida*, 432 *U.S.* 282, 302, 97 *S.Ct.* 2290, 2303, 53 *L.Ed.2d* 344, 362 (1977) (quoting *Murphy v. Florida*, 421 *U.S.* 794, 800, 95 *S.Ct.* 2031, 2036, 44 *L.Ed.2d* 589 (1975) and *Irvin, supra*, 366 *U.S.* at 723, 81 *S.Ct.* at 1642, 6 *L.Ed.2d* at 756)]

See *State v. Royster*, 57 *N.J.* 472, 482–483 (1971), *cert.* den., 404 *U.S.* 910, 92 *S.Ct.* 235, 30 *L.Ed.2d* 182 (1971). Discerning use of *voir dire* by the trial court—and, if necessary, defense counsel, see *R.* 1:8–3(a)—is a reliable means of eliminating prejudiced jurors. See, *e. g., State v. Deatore*, 70 *N.J.* 100, 104–106 (1976). Even more certainty could be obtained by the empanelling of a foreign jury at the request of either prosecution or defense, see *R.* 3:14–2, and its sequestration during trial "in the interests of

justice," see *R.* 1:8–6(a). We cannot say with any degree of assurance that an impartial jury has been rendered impossible by publicity. Resolution of this issue must await the results of efforts by the trial court and the State to insure the absence of prejudice among the specific jurors who will hear the case.

Defendant also asserts that the prejudice resulting from the illegally based publicity will extend to prospective witnesses. See *Weatherford, supra,* 429 *U.S.* at 563–564, 97 *S.Ct.* at 847–848, 51 *L.Ed.*2d at 44–45 (Marshall, J., dissenting); *Barber, supra,* 24 *Cal.*3d at 757, 598 *P.*2d at 826, 157 *Cal.Rptr.* at 666. The trial court made no findings as to the existence of prejudice in specific witnesses. As with potential jurors, therefore, we must consider defendant's claim in the abstract, in advance of trial. Again we disagree that the publicity surrounding defendant's overheard conversations necessarily infects everyone who learns of them with prejudice. In the case of witnesses, however, the traditional manner of exposing prejudice—cross-examination—is not fully available. To question a witness before a jury about his knowledge of overheard statements would be unthinkable. Yet if counsel cross-examines a witness in an indirect way regarding his bias, the effect on a jury may be lost. The problem of prejudiced witnesses may not receive adequate exposure through conventional trial procedures.

This does not mean that the prosecution must be dismissed, however. It is possible, for example, that all the prosecution's witnesses will be ignorant of the official eavesdropping, or that a witness aware of the incident will be able to testify free from prejudice. We therefore see no infringement of the right to a fair trial if the trial court were to question prospective witnesses on *voir dire* to make a threshold determination whether they would testify impartially. As in other cases involving constitutionally harmless error, the State will be required to prove beyond a reasonable doubt that the credibility of the witness is not affected by any "tainted" knowledge of defendant's statements. If the trial court finds that a witness with such knowledge "can lay aside his impression or opinion," *Dob-*

*bert, supra,* 432 *U.S.* at 302, 97 *S.Ct.* at 2303, 53 *L.Ed.*2d at 362, and render testimony free from the influence of the illegally grounded publicity, then he may testify without the danger of hidden prejudice.[14]

## VI

### *The Exclusionary Remedy*

Since the threat of taint extends to evidence as well as witnesses, the threshold hearing should also evaluate the State's procedures for presenting untainted evidence along with untainted witnesses. The question remains whether the exclusion of taint from trial alone adequately vindicates defendant's constitutional rights and deters future incidents of such egregious conduct.

▮▮▮ We find that under the circumstances of this case, the only appropriate remedy is exclusion of tainted witnesses and evidence from the grand jury and at trial. Because the violation of the right to the effective assistance of counsel was so serious, and because the guarantee of a fair trial has been so threatened by the insolence of local law enforcement officers, the fruits of their lawlessness must not be allowed to aid a prosecution in any manner. The State must establish beyond a reasonable doubt that it can conduct a prosecution with unsullied evidence and witnesses—even before an indictment. To permit the State to proceed before the grand jury with illegally obtained evidence would expose defendant to the threat of a tainted and compromised prosecution. It would fail to deter those who would seek the publicity of an indictment even if a subsequent trial would fail for lack of untainted evidence. It would also prolong the injury to defendant's fundamental rights until the grand jury acts. In these aggravated circumstances, the traditional justifications for the exclusionary rule call for its

---

[14]There is the possibility that witnesses compelled to testify for defendant will be tainted by prejudice. While irreparable harm could result from the loss of testimony that might have aided defendant, we cannot resolve this issue in advance of a trial where the problem, if it appears at all, will appear in concrete form.

application prior to grand jury proceedings. See *United States v. Peltier*, 422 *U.S.* 531, 536–537, 95 *S.Ct.* 2313, 2317, 45 *L.Ed.*2d 374 (1975); *Mapp v. Ohio*, 367 *U.S.* 643, 659–660, 81 *S.Ct.* 1684, 1693–1694, 6 *L.Ed.*2d 1081 (1961); *State v. Howery*, 80 *N.J.* 563, 569–570 (1979); *cf. United States v. Calandra*, 414 *U.S.* 338, 94 *S.Ct.* 613, 38 *L.Ed.*2d 561 (1974); *Silverthorne Lumber Co. v. United States*, 251 *U.S.* 385, 40 *S.Ct.* 182, 64 *L.Ed.* 319 (1920). We therefore hold that defendant is entitled now to test the State's good faith and ability to proceed fairly and lawfully, prior to the presentation of any evidence to the grand jury. That body may not receive evidence obtained in blatant violation of the federal and State constitutions, *U.S.Const.*, Amend. IV, VI; *N.J.Const.* (1947) Art. I, pars. 7, 10, and State law proscribing illegal electronic surveillance, *N.J.S.A.* 2A:156A–3, –21. Accordingly, we hold that a threshold hearing to determine the extent of taint should take place before the grand jury begins to receive evidence.

## VII

### *Conclusion*

The official conduct which is the predicate of this appeal profoundly shocks the judicial conscience. It was a brazenly lawless attempt to seek a conviction at the expense of fundamental individual rights. While we perceive no threat to judicial integrity in this apparently isolated instance, any future, similar incidents would raise grave questions of judicial complicity were we to apply anything less than the most severe sanction. We would therefore not hesitate in the future to bar any prosecution founded on an intrusion into the attorney-client relationship on grounds of fundamental fairness. We eschew such an approach today, however, because of the singular nature of the official abuse and because of the extraordinary manifestation of good faith at the highest levels of State law enforcement. We hold that the prosecution shall proceed subject to the conditions imposed on the selection of jurors and the offering of testimony at trial. The prosecution shall also be restricted by any exclusionary remedies that the trial court shall fashion before grand jury proceedings begin.

To implement this mandate, the State is hereby ordered forthwith to certify to the trial court all the evidence that it considers to be tainted and all that it considers to be untainted. For each item of evidence, the State shall also certify the date on which any prosecutorial authority learned of it. If the State claims that an otherwise tainted item of evidence was independently acquired by an untainted prosecutor or investigator, it shall certify for that item the name of the untainted person and the dates of both tainted and untainted acquisitions. The State shall similarly certify the names of tainted and untainted witnesses, and indicate for each witness the matters on which his testimony could be tainted and those matters on which testimony is possibly free of any taint. The trial court shall then set a date for a hearing to determine which evidence and witnesses may be presented to the grand jury. The court shall use the State's certification as its starting point for determining which items of evidence and witnesses should be scrutinized for taint. After the trial court determines by order which evidence is free from taint, the State may present such evidence to the grand jury, and further proceedings would follow in normal course. Should the grand jury return an indictment, the State remains constitutionally obligated to proceed at trial with untainted witnesses and untainted evidence. The defendant will have the continuing right throughout such a prosecution to challenge the legality of the State's presentation.

For the foregoing reasons, the judgment of the Superior Court, Law Division, is reversed. The State is hereby enjoined from conducting any grand jury proceedings in this matter until the trial court has ruled on the suppression of tainted evidence and witnesses from grand jury deliberations. The case is remanded to the trial court for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For affirmance*—none.