STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. HARRY D. SUGAR, DEFENDANT-APPELLANT.

Argued September 11, 1984—Decided July 24, 1985.

216

*Jay H. Greenblatt* argued the cause for appellant (*Greenblatt, Greenblatt & Riesenburger,* attorneys; *Jay H. Greenblatt* and *Mitchell H. Kizner,* on the briefs).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General

of New Jersey, attorney; *Catherine A. Foddai* and *Mark Paul Cronin*, Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

HANDLER, J.

This is the second time we have considered this case. On the first occasion, we granted the State's motion for direct certification to review the dismissal by the Superior Court, Law Division, of the municipal court presentment charging the defendant, Dr. Harry D. Sugar, with the murder of his wife. The dismissal was based on the unlawful tape-recording by the arresting police officers of a privileged and confidential conversation between the defendant and his attorney while defendant was still in police custody following his arrest. *State v. Sugar*, 84 *N.J.* 1 (1980) (*Sugar I*).

This Court determined that the police misconduct constituted an egregious violation of defendant's constitutional right to counsel. Although the gravity of the constitutional abridgement demanded extraordinary relief, we determined that an appropriate remedy could be fashioned short of a dismissal of the criminal prosecution. Accordingly, we directed that any witness or evidence "tainted" by the illegal eavesdropping could not be used by the State to indict or prosecute the defendant. *Id.* at 25. To effectuate that ruling, we ordered that the trial court hold a threshold hearing—a taint hearing—at which the State would have the burden of demonstrating beyond a reasonable doubt that "it [could] conduct a prosecution with unsullied evidence and witnesses * * *." *Id.*

Thereafter, the required taint hearing was held, following which the court ruled on the admissibility of proffered evidence and the competency of particular witnesses. The State was then permitted to proceed with the prosecution of Dr. Sugar. On May 4, 1981 a State grand jury returned a one-count indictment charging Dr. Sugar with the murder of Joan Sugar in violation of *N.J.S.A.* 2A:113–1 and 2. Defendant pleaded not

guilty and, following a change of venue, the trial commenced on July 6, 1981 and concluded on August 4, 1981, when the jury returned a verdict of guilty of second degree murder. On September 11, 1981 the trial judge sentenced defendant to eighteen to twenty years in prison.

Defendant then filed a notice of appeal. With one judge dissenting, the Appellate Division affirmed defendant's conviction. Defendant filed an appeal as of right with this Court under Rule 2:2–1(a)(1) and (2) on the grounds that the case involved a dissent and also raised substantial constitutional questions. For the reasons that follow, we reverse the judgment of the Appellate Division. We set aside the conviction and remand this matter for further proceedings.

I.

In our previous decision our concern was solely with whether police misconduct had resulted in an infringement of defendant's constitutional rights and what relief was appropriate to redress such a constitutional violation. 84 *N.J.* at 8–9. The facts directly relating to the commission of the crime as such were not directly material to our decision. Now, however, we must consider these facts in determining whether a reversal of defendant's conviction is required in light of additional asserted prejudicial errors of constitutional dimensions.

The facts of record surrounding the commission of the crime indicate that on July 10, 1979, defendant filed a missing persons report regarding his wife. He reported that a few evenings earlier he had had a dispute with his wife lasting approximately six hours; she had left in her automobile and had not returned since. Thereafter the police instituted a search for Joan Sugar. During the remainder of July, Sugar appeared to be cooperative with the police in their attempts to locate his wife.

On July 16 Lieutenant Tirelli, Chief of Detectives, assigned Detective John Mazzeo to the missing persons investigation. Mazzeo followed up on several leads given by Sugar, inter-

viewed Sugar several times, and spoke to Mrs. Sugar's two daughters, as well as to Sugar's medical assistant, Barbara Myers.

In mid-July Albert Rochetti, who rented and farmed part of Dr. Sugar's property, saw fifteen to twenty "buckets" of dirt lined up in a row approximately 75 feet from defendant's front door. On July 27 Mazzeo was advised of these piles of dirt and he went to the property to verify that the piles existed. On July 30 Mazzeo obtained samples of the dirt and then decided to search the house to determine if the dirt came from Sugar's basement.

On July 31 Mazzeo asked Sugar to come down to the Vineland Police Department. The officers asked defendant about the dirt piles. Defendant claimed that the dirt came from a garden he was making. Defendant was then told that he was a suspect and he was given *Miranda* warnings prior to further questioning. At that time, defendant claimed that he could not remember what happened after his wife left. The officers asked defendant if he would take a polygraph or submit to hypnosis. Defendant responded that he wanted to consult his lawyer because he was feeling upset and could not do it then. After the officers gave defendant his *Miranda* warnings, they also asked for permission to search his house and property; he agreed and signed a form consenting to the search.

After this meeting, on July 31, when Sugar arrived back at his home the police were already present. During the ensuing search, defendant lay on his bed. Mazzeo and the other officers searched the house and basement thinking that they would find evidence of a burial. They walked around the grounds and Mazzeo observed dry leaves under a picnic table. The leaves resembled the leaves in a fish pond several feet south of the table. They picked up the table and started to brush some of leaves away and noticed that the ground was soft. Mazzeo testified that he wanted to investigate further but that the other officers dissuaded him from doing so.

Both Mazzeo and Lieutenant Tirelli initially claimed that heavy rains in the beginning of July accounted for the soft soil. After defendant presented weather information indicating only scant rain during this period, Mazzeo admitted, under questioning by the court, that he had only mentioned the rain as an excuse to cover up for his failure to search thoroughly under the picnic table.

Defendant testified that he next spoke to the police on August 2 and 3, when he called Mazzeo to let him know that he was going to California to visit his son for a few days; he did not want to give the police the impression that he was running away and he wanted them to have his phone number in case there were any "new developments." Defendant stated that Mazzeo called him back on August 3 and told him that the police were going to use a psychic to locate Mrs. Sugar and asked him to bring some personal objects of Mrs. Sugar's to the police station.

According to Mazzeo, when he called defendant and told him about the psychic, defendant said "I will do anything to locate my wife." Both Mazzeo and Tirelli further testified that they met with defendant on August 3, when he dropped off the personal items, and defendant orally agreed to let the police walk on his property again. They claimed that Sugar said he would appreciate the police presence on his property while he was away. Tirelli also testified that Sugar told them to do whatever was necessary to find his wife and that the police could enter his house "if necessary."

Defendant, on the other hand, denied that he met face-to-face with either Tirelli or Mazzeo when he dropped the items off at the police station on August 3. According to defendant, he gave the requested items to the officer sitting at the desk with instructions to give them to Detective Mazzeo. Defendant then left and did not communicate with the police again until his return from California. He testified further that after July 31 the police never asked for permission to re-enter his property

and that they never indicated that they might go back on the property. He also said that after the July 31 search, he no longer wanted the police on his property and assumed that they would ask permission to re-search the property.

At 4:00 p.m. on August 6, Tirelli and Mazzeo went back to defendant's house with a psychic and conducted another search. The psychic walked around the property and sat in Mrs. Sugar's car. Mazzeo had a shovel in his car and Tirelli asked him "do you feel like digging?" They took the shovel over to the picnic table, and as they approached it, Mazzeo smelled a foul odor. They moved the table and dug. When they hit an object, they called for the assistance of several members of the Vineland Police. The object was a dead body. The police then proceeded to uncover the body and photograph the grave site. At the morgue dental x-rays confirmed that the body was that of Mrs. Sugar.

Defendant was arrested on August 7 and was taken to the Vineland Police Department Detective Bureau. He was again advised of his *Miranda* rights and then questioned by Detectives Tirelli, Mazzeo and William Walters and Captain Joseph Soracco, Chief Investigator of the Cumberland County Prosecutor's office. At this time, defendant could recollect only having engaged in a seven-hour argument with his wife, that she got in her car and left, after which his mind "went blank." During this session, defendant requested that he be advised by legal counsel, and around 1:00 a.m. he succeeded in contacting a member of the Vineland law firm of Greenblatt and Greenblatt.

At approximately 2:40 a.m., Rocco Tedesco, an attorney associated with the firm, arrived at the police station and interviewed defendant in a room adjacent to the Detective Bureau. As noted in our previous opinion, during this interview, Detective Tirelli undertook to eavesdrop on and record defendant's conversation with Tedesco.

Later in the morning Mazzeo again advised defendant of his *Miranda* rights and asked him if he wanted to say anything.

Defendant requested to speak to his lawyer Jay Greenblatt, who had already arrived at the police station. When defendant began conversing with his attorney in private, Tirelli, together with Soracco, and Lieutenant Guy Buscemi, again proceeded to eavesdrop on and record the conversation between defendant and his lawyer. Mazzeo entered Tirelli's office and was instructed by Tirelli to take notes on the attorney-client conversation; the monitored conversation was also partially heard by Detective Walters, who was allowed the next day by Tirelli to listen to the tape-recording of the conversation.

The monitoring of the attorney-client conversation continued for about 45 minutes. As noted in our previous opinion, neither defendant nor his attorneys were aware that their conversation had been monitored. According to the trial court's findings, after this conversation was concluded, Tirelli advised defendant that he would be charged with specific offenses.

On the same day, August 7, the Vineland Police executed a search of defendant's home pursuant to a warrant that was very specific in terms of the items to be seized. Defendant's attorney quickly became suspicious of the possibility that there had been an eavesdropping of his conversation with his client. He later received a phone call from an informant who told him that the conversation had been "bugged."

Greenblatt contacted Cumberland County Assignment Judge Francis, who suggested that Greenblatt contact the State Division of Criminal Justice. Upon confirmation that an eavesdropping and recording had occurred, the Attorney General superseded the Vineland Police Department and the Cumberland County Prosecutor's office regarding the investigation of the homicide and possible prosecution of defendant. The steps taken by the Division of Criminal Justice to pursue the investigation and proceed with the prosecution have already been recounted. 84 *N.J.* at 8–9.

Pursuant to our remand order, the trial court conducted a series of taint hearings on August 14–17, 20–23 and November

6 and 12, 1980. First, the court granted, over defendant's strenuous objection, the State's application for an order closing the proceedings to the press and the public. The trial court also closed the contemporaneous hearings dealing with defendant's motion to suppress all evidence the State derived from the warrantless search of Sugar's premises by the Vineland Police on August 6, 1979.

On this record the Appellate Division, as noted, affirmed defendant's conviction of second degree murder. The Appellate Division held unanimously that the prosecution against Dr. Sugar was not based on "tainted" witnesses and evidence insofar as the prosecution relied on the testimony of Detective Mazzeo and further, that defendant's rights of confrontation, including specifically the right to cross-examine Mazzeo, had not been violated. The court also unanimously ruled that evidence relating to defendant's purchase of certain drugs was not derived from tainted witnesses, and that expert opinions on the cause of death involving such drugs were properly admitted at trial. The court also agreed that the mandated taint hearing, as well as the hearing on defendant's motion to suppress evidence, were properly closed to the public by the trial court. The dissenting judge differed from the majority on one issue, that concerning the validity of a second warrantless search of defendant's property, which resulted in the discovery of Mrs. Sugar's body. Unlike the majority, the dissenting judge would have ruled that this search was not a valid, consensual search and that the body and "all other evidence derived from examination and testing of the body," should have been suppressed; he would have reversed and remanded for a new trial. These rulings constitute the issues we consider on this appeal.

## II.

The trial court found that the only witness involved in or exposed to the illegal intercept who could not testify for purposes of the grand jury proceedings and at trial was Tirelli.

According to the court, Tirelli had too much at stake in the outcome of the trial to be expected to testify truthfully. The trial court, however, was satisfied beyond a reasonable doubt that Mazzeo would be able to testify free from taint and rejected defendant's claim that Mazzeo was shaping his testimony around the illegally intercepted information.[1] The trial court's decision to permit Mazzeo to testify was also based on his perception that despite Mazzeo's desire to exonerate himself, he could "certainly be tested by cross-examination before a jury in the ordinary traditional manner of cross-examination."

Defendant contends that Mazzeo should not have been permitted to testify at trial because he "played an integral role in the eavesdropping and because his prior testimony and reports showed that he was a completely untrustworthy witness whose statements were shaped by a desire to minimize the impact of police wrongdoing on the prosecution." Defendant also contends that, under the circumstances, Mazzeo's credibility could not be effectively subjected to cross-examination.

### A.

We acknowledge that the opinion in *Sugar* I does not clearly and unmistakably express our determination that a witness with direct first-hand knowledge of the contents of the unlawful intercept, particularly a witness who had engaged in or attended the intercept itself, could not thereafter testify in the prosecution of defendant. Nevertheless, that is the purport of our prior decision. We confirm and reiterate that ruling: as a matter of law, a person who actually participated in, attended, or was contemporaneously informed of the unlawful intercept

---

[1] We note that no contention is made by defendant concerning any rulings with respect to the participation as witnesses of Sorrocco, Buscemi and Walters, all of whom either actually participated in or attended, or were contemporaneously informed of, the illegal wiretaped conversation. The State apparently relied primarily on the testimony only of Mazzeo and not on these other investigating officers, in presenting the matter at trial.

must be deemed to have been tainted by his direct knowledge of the intercept; he is therefore disqualified to testify as a witness in defendant's prosecution. Consequently, we disagree with the trial court's ruling allowing Mazzeo to testify in aid of the State's prosecution.

The Court in *Sugar* I did state that the trial court should admit the testimony of those witnesses who "can lay aside [their] impression or opinion, and render testimony free from the influence of the illegally grounded publicity." 84 *N.J.* at 24–25. This direction, however, was not intended to apply to witnesses, such as Mazzeo or Tirelli, who were actually responsible for the illegal wiretap. Our direction concerning witnesses who could overcome any potential taint was included in that portion of the Court's opinion dealing with prejudicial publicity. This focused on whether information relating to the illegal intercept had reached members of the public, including potential witnesses, thereby imperiling a fair trial; the Court was there referring only to persons who may have indirectly learned of or heard about defendant's intercepted statement. As to them, the trial court was authorized to determine whether they could testify truthfully in spite of their exposure or "taint."

In this context, we were not referring to persons who had actually participated in, attended, or contemporaneously received information of the illegal intercept. Witnesses so directly involved in the illegal intercept itself were tainted in a direct and primary sense. We have no hesitancy in directing that they be excluded from any attempt to prosecute the defendant. We so stated in our previous opinion:

> We find that under the circumstances of this case, the only appropriate remedy is exclusion of *tainted witnesses* and evidence from the grand jury and at trial. Because the violation of the right to the effective assistance of counsel was so serious, and because the guarantee of a fair trial has been so threatened by the insolence of local law enforcement officers, the fruits of their lawlessness must not be allowed to aid a prosecution in any manner. [84 *N.J.* at 25 (emphasis added).]

In cases of egregious violation of a defendant's right to counsel through tactics similar to those practiced in this case,

courts have recognized the need for an effective judicial anti-
dote. When law enforcement officials interfere with a defend-
ant's ability to discuss strategy with counsel or cause a defend-
ant to lose trust in counsel, courts have consistently dismissed
the criminal prosecution. *See, e.g. United States v. Levy,* 577
*F.*2d 200 (3d Cir.1978); *Barber v. Municipal Ct.,* 24 *Cal.*3d 742,
157 *Cal.Rptr.* 658, 598 *P.*2d 818 (1979). Certain governmental
intrusions on attorney-client relations, even when no severe
prejudice to the defendant is apparent, must be dealt with in a
manner that denies all effect to the illegal activity. *United
States v. Levy, supra,* 577 *F.*2d 200; *see also State v. Bellucci,*
81 *N.J.* 531 (1980) (violation of right to effective assistance of
counsel because of conflict of interest requires reversal of
conviction even without a showing of actual prejudice). Gov-
ernmental misconduct that warps and perverts the proper ad-
ministration of justice warrants severe sanctions. In *State v.
Molnar,* 81 *N.J.* 475 (1980), cited in *Sugar I,* the Court, discuss-
ing the defense of entrapment arising from official misconduct,
stated:

> When the defendant establishes entrapment, he must be acquitted—not for
> want of criminal conduct, but because the methods employed, by the law
> enforcement officials are repugnant to public policy. Judicial abhorrence of
> entrapment springs from the fundamental precept that courts may not abide
> illegality committed by the guardians of the law. [81 *N.J.* at 484 (citation
> omitted).]

*See also State v. Rockholt,* 96 *N.J.* 570 (1984) (beyond statutory
definition of entrapment, as a matter of fundamental fairness
there must be a continuing constitutional sanction against pat-
ently offensive conduct by law enforcement officials).

The remedy we prescribe—the exclusion of primarily tainted
witnesses from the prosecution—is minimally required in view
of the profoundly offensive nature of the official misconduct in
this case. The deterrence of unlawful official conduct in such
circumstances assumes dominant importance. A constitutional
violation of such gravity demands stern measures and extraor-
dinary relief not only to redress the constitutional injury but
also to thwart even the temptation to repeat such conduct.

We are, moreover, satisfied that in this case Mazzeo, like Tirelli, exhibited absolutely no good-faith reliance on judicial authority. *Cf. United States v. Leon*, 468 *U.S.* ——, 104 *S.Ct.* 3405, 82 *L.Ed.*2d 677 (1984), (good faith reliance on the validity of defective search warrant may validate search and seizure). They engaged in activity they knew or should have known was offensive and illegal. They unlawfully eavesdropped on defendant's conversations with the attorney Tedesco and repeated their eavesdropping a few hours later when defendant conferred at length with his attorney Greenblatt.

Additionally, these police officers, in effect, tampered with the lawful and proper administration of justice. Fruits of the unlawful intercept were made the basis for formal charges brought against the defendant; they were also used to secure a judicially-authorized search warrant, thereby implicating the courts and compromising judicial integrity. *See State v. Molnar, supra*, 81 *N.J.* at 484 ("when official conduct inducing crime is so egregious as to impugn the integrity of the court that permits a conviction, the predisposition of the defendant becomes irrelevant.") No court of this state can be permitted to become a party to the blatant illegality that occurred in this case.

We are convinced that these witnesses are tainted by their misconduct and cannot be allowed to participate to any degree in the criminal prosecution of the defendant. It is to be regretted that our prior decision did not make this more clear. Nevertheless, the trial court erred in failing to exclude Mazzeo, as a matter of law, from testifying as a witness in the prosecution.

### B.

Defendant also contends that it was error for the trial court to have allowed Mazzeo to testify as a witness because defendant was effectively foreclosed from cross-examining Mazzeo. Although we have ruled that Mazzeo is to be excluded as a

witness because of his personal involvement in the illegal intercept, the ability of the defendant effectively to cross-examine Mazzeo was a factor that prompted the trial court to conclude that Mazzeo's taint was nullified. It is important therefore to address this aspect of Mazzeo's competence as a witness.

It is clear that in permitting Mazzeo to testify the defendant could not through cross-examination allude to or elicit any facts relating to the intercept itself because of the adverse effect such a reference would have upon the jurors. "To question a witness before the jury about his knowledge of overheard statements would be unthinkable." *Sugar I*, 84 *N.J.* at 24. As the defendant points out, exposing such facts through cross-examination would generate inferences about information that was overheard and suppressed as a result of the unlawful intercept. Yet, Mazzeo's bias or motive to testify untruthfully could not be established without introducing facts and circumstances surrounding the intercept. Consequently, it would be intolerable as a matter of due process and fundamental fairness to allow Mazzeo to testify in a setting that forecloses the defendant from showing bias.

The right to cross-examine and test for bias at a plenary trial of criminal charges is indispensable. *State v. Pontery*, 19 *N.J.* 457, 472 (1955). It is a right of constitutional dimensions. *Pointer v. Texas*, 380 *U.S.* 400, 85 *S.Ct.* 1065, 13 *L.Ed.*2d 923 (1965); *see State v. Engel*, 99 *N.J.* 453 (1985). There can be no question that a defendant must be afforded the opportunity through effective cross-examination to show bias on the part of adverse state witnesses. *Davis v. Alaska*, 415 *U.S.* 308, 94 *S.Ct.* 1105, 39 *L.Ed.*2d 347 (1974); *see State v. Hare*, 139 *N.J.Super.* 150 (App.Div.), certif. denied, 70 *N.J.* 525 (1976); *see also State v. Mazur*, 158 *N.J.Super.* 89 (App.Div.), certif. denied, 78 *N.J.* 399 (1978) (defendant, accused of conspiracy to engage in misconduct in office, was improperly precluded

from cross examining an adverse witness for motive to testify untruthfully).

In this case, defendant was denied the opportunity to suggest to the jury the possibility of Mazzeo's bias. The ability to probe the reasons for possible bias can be critically important when a witness's credibility is at issue. *United States v. Trotter*, 529 *F.*2d 806, 814 (3d Cir.1976); *see State v. Crudup*, 176 *N.J.Super.* 215, 221 (App.Div.1980) (where police officer's motive was important, trial court improperly restricted defendant's effort to cross-examine officer "to fully test the State's proofs and show any possible bias, prejudice, interest, or ulterior motive").

Here, Mazzeo's credibility was sharply in issue. We do not, in the circumstances presented, perceive any difference between Mazzeo and Tirelli, whom the trial court determined was tainted as a matter of "fact." Mazzeo admitted to being in "hot water" over this situation; he acknowledged his desire to see Dr. Sugar convicted. Mazzeo also had been exposed to notoriety; his name had been publicized in the local newspapers in connection with the unlawful police conduct and he had been mentioned in this Court's earlier opinion. In addition, Mazzeo had been demoted from detective to patrolman and was exposed to criminal charges for his involvement in the eavesdropping. Consequently, securing a conviction in this case would serve to vindicate or excuse Mazzeo's own behavior.

In addition to the presence of an obvious motive to lie, it does not appear that the trial court itself believed that Mazzeo was a truthful witness. There were numerous inconsistencies in Mazzeo's testimony strongly suggesting his lack of credibility. These related to the reasons offered for not digging under the picnic table during the July 31 search. Further, his testimony regarding the psychic or psychics was imprecise and inconsistent as to who they were, what they did, and what they told him concerning Mrs. Sugar's disappearance. There are also seriously contradicted statements of Mazzeo concerning defendant's

asserted permission or acquiescence as to the subsequent search of his house on August 6.

Mazzeo was permitted to testify only because the court believed that his lack of veracity could be tested by cross-examination, thereby enabling the jury, as in any case, to determine credibility. As we have already indicated, however, this case is not "any case." Under the circumstances defendant was unable effectively to cross-examine Mazzeo. Consequently, the trial court's threshold finding that Mazzeo demonstrated a lack of truthfulness was not, and could not be, overcome.

In sum, we conclude that Mazzeo was a tainted witness and was ineligible to testify in any way to advance the prosecution of the defendant. Further, it was reversible error to have allowed Mazzeo to testify because, in view of his apparent bias and lack of veracity, defendant was denied the right to engage in any effective cross-examination that could have served to challenge the witness's credibility.

### III.

Defendant argues that the results of the search conducted at his home on August 6, 1979 should be suppressed because the search was undertaken without a warrant or the valid consent of defendant.[2] We conclude that on the evidence presented, this search cannot be upheld. The trial court determined that the warrantless search was based on defendant's valid consent or acquiescence. However, this determination was itself drawn in large part from the testimony of Mazzeo, whom we have found to be ineligible to testify as a witness. We now rule that this testimonial disqualification applies to the suppression hearing. Consequently, there is insufficient com-

---

[2]The trial court suppressed evidence seized as a result of the searches that followed the intercepted conversation. The court concluded that this evidence was derived from the information obtained from overhearing defendant's conversation with his lawyer and was thus impermissibly tainted. The State does not contend that these rulings were incorrect. We agree.

petent evidence to sustain the search on implied consensual grounds.

## A.

The trial court denied defendant's motion to suppress as evidence the body of defendant's wife, which was discovered by the police in a search conducted on defendant's property on August 6th. The trial court ruled that defendant had waived his right to insist upon a search warrant by impliedly consenting to the search of the area surrounding his house.

The court found that a "valid consent existed by implication flowing from the express written consent of July 31." While it was clear that no express oral consent was requested of, or given by, the defendant with respect to the August 6th search, according to the court "[t]he existence and scope of the implied consent in the instant case is apparent from the defendant's conduct and words when considered together with the original express written consent given to the police."

We must reject the trial court's determination because it was impermissibly based on the testimony of Mazzeo. Mazzeo by virtue of his unlawful activities in participating in the illegal wiretap has effectively removed himself as a witness in this case. *Supra* at 231–232. As we have noted, the State is not entitled in this case to derive any benefit in pursuing its prosecution of the defendant from a witness of Mazzeo's cast. We now specifically rule that, with respect to Mazzeo, the indelibility of the original taint, the inability to be subjected to effective cross-examination, and the apparent lack of veracity, which call for his disqualification as a prosecution witness, apply with as much vigor to the hearing on the motion to suppress evidence as they do to the grand jury proceeding and the criminal trial itself.

It is clear that it was Mazzeo's testimony that provided the essential basis for the trial court's conclusion that the search of defendant's house on August 6 was based on defend-

ant's implied consent. The trial court concluded from this testimony—as well as from the equally-tainted testimony of Tirelli—that defendant had "surrendered any expectation of privacy" and that he was cooperative in the police investigation. The court noted that Mazzeo and Tirelli "specifically advised" defendant that they would attempt to utilize any information that might be gleaned through the use of the psychics and that they would "pursue any such leads in his absence" and, according to Mazzeo and Tirelli, "the defendant encouraged the officers to do so." Further, the trial court credited their testimony in concluding that "[t]he defendant acquiesced in the suggestion by Mazzeo and Tirelli that their investigation might again require police presence on his property should the psychic's suggestion lead them in that direction." It is abundantly clear that the conclusion that defendant had impliedly consented to the search rests on incompetent testimony.

We recognize that continuing warrantless searches pursuant to an original express consent to search can raise serious constitutional questions concerning the reasonableness of such a subsequent search and seizure. *Compare, e.g. State v. Brochu*, 237 *A.*2d 418 (Me.1967); *People v. Chism*, 32 *Mich. App.* 610, 189 *N.W.*2d 435 (1971), aff'd, 390 *Mich.* 104, 211 *N.W.* 2d 193 (1973) *with, e.g., Gray v. State*, 441 *A.*2d 209, 221–22 (Del.1981); *Ferguson v. Caldwell*, 233 *Ga.* 887, 213 *S.E.*2d 855, 867 (1975); *State v. Fredette*, 411 *A.*2d 65 (Me.1979); *Crum v. State*, 349 *So.*2d 1059 (Miss.1977); *Thompson v. McManus*, 512 *F.*2d 769 (8th Cir.1975). We also acknowledge that the constitutional standard that we apply in sustaining a search based upon a waiver of the warrant requirement by consent is exacting. *State v. Johnson*, 68 *N.J.* 349 (1975). A valid consent to a search must be clear, knowing, voluntary, unequivocal, and express. *Id.* Nevertheless, we need not in this case resolve the questions as to the validity of successive searches or the adequacy of evidence to support a search by consent.

We are satisfied that the basis in this case for a consensual or successive search of defendant's house conducted one week after an initial search, in defendant's absence and without his knowledge, cannot be supported on the present record. The finding of implied consent is based upon the factual inferences extrapolated from the inadmissible testimony of Mazzeo, as well as of Tirelli. The trial court's ruling sustaining the search on this record must therefore be set aside.

## B.

The circumstances of this case impel us to consider an additional ground that must be addressed in determining whether any of the evidence derived from the warrantless search of defendant's property on August 6th may be used by the State in any further criminal prosecution of defendant.

The critical evidence derived from this search was the victim's body. In defending the motion to suppress, the State had contended, in the alternative, that this evidence would have been admissible regardless of the asserted invalidity of the search because its discovery was inevitable. In its denial of defendant's motion to suppress evidence, the trial court ruled that it "was unnecessary to consider the State's contention concerning the 'inevitable discovery' doctrine" because the search was valid on the basis of defendant's "consent." Nevertheless, the court said that "[i]n any event, the State here has simply failed to discharge its burden to show that the body would have been inevitably discovered absent the August 6 search in issue."

The State did not appeal this point because it had prevailed in both lower courts. It is not clear that the trial court made a definitive finding on this point or that its finding was essential to its determination sustaining the search. Because the issue has not been squarely presented, we conclude that this aspect of the search may be reconsidered on a remand of this case in the event the State determines to continue its prosecution of

defendant. Accordingly, we express certain principles for the guidance of the parties and the trial court on such remand.

The inevitable discovery exception to the exclusionary rule was recently addressed by the Supreme Court. In *Brewer v. Williams*, 430 *U.S.* 387, 97 *S.Ct.* 1232, 51 *L.Ed.*2d 424 (1977), the defendant was taken into custody as a suspect in the murder of a child. His lawyer and the investigating police officers agreed that he would not be questioned. Later, however, one of the officers suggested that Williams tell them where the child was so that she could be given a "Christian burial" by her parents. Williams then led the police to the body. The Court ruled that the questioning violated defendant's right to counsel and that the resulting incriminating statements were tainted. The evidence relating to the location and condition of the body were also products of the unconstitutional police action. The Court noted, however, that such evidence "might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams." *Id.* at 407 n. 12, 97 *S.Ct.* at 1243 n. 12, 51 *L.Ed.*2d at 441 n. 12.

At the second trial, the trial court admitted evidence relating to the condition of the body, results of medical tests, and articles of clothing found on the dead child. Williams's ensuing conviction for first degree murder was upheld by the Iowa Supreme Court. *State v. Williams*, 285 *N.W.*2d 248 (1979). On habeas corpus review, the United States Supreme Court ultimately affirmed the conviction and, for the first time, approved the inevitable discovery exception to the exclusionary rule. *Nix v. Williams*, 467 *U.S.* 431, 104 *S.Ct.* 2501, 81 *L.Ed.*2d 377 (1984). The evidence clearly showed that had Williams not led the police to the body, a search party, which was in the process of meticulously searching the area, would have inevitably discovered the body.

The Court held that employing the inevitable discovery exception to admit evidence that would otherwise be subject to the

exclusionary rule is not constitutionally impermissible. This exception was seen as a logical extension of the long-standing rule that allows the admission of illegally-obtained evidence if knowledge of the evidence was gained from an independent source. *See Silverthorne Lumber Co. v. United States*, 251 *U.S.* 385, 40 *S.Ct.* 182, 64 *L.Ed.* 319 (1920). Consistent with the deterrent purposes of the exclusionary rule, the prosecution is not to be put in an advantageous position by using illegally obtained evidence. However, the social costs associated with the exclusionary rule demand that the prosecution not be unnecessarily placed in a worse position because of earlier police misconduct. "The independent source rule allows admission of evidence that has been discovered by means wholly independent of any constitutional violation," *Nix v. Williams, supra,* 467 *U.S.* at ——, 104 *S.Ct.* at 2509, 81 *L.Ed.*2d at 387, thereby putting the police in the same position that they would have been in had no police misconduct occurred. Similarly, the deterrent purposes of the exclusionary rule are not served by excluding evidence that, but for the misconduct, the police inevitably would have discovered. If the evidence would have been obtained lawfully and properly without the misconduct, exclusion of the evidence would put the prosecution in a worse position than if no illegality had transpired.

An extraordinary range of fact patterns has led to the admission of evidence under the inevitable discovery exception. Because satisfaction by the State of the exception's requirements involves proof of hypothetical independent sources of obtaining the evidence, the exception's application is sometimes problematical. Difficulties have arisen especially with respect to the degree of probability necessary to establish that the evidence would have been discovered, *compare United States v. Palumbo,* 742 *F.*2d 656 (1st Cir.1984) *with United States v. Allard,* 634 *F.*2d 1182 (9th Cir.1980), and with respect to the possibility that unguarded applications of the rule will encourage unconstitutional shortcuts, *State v. Williams, supra,* 285

*N.W.*2d at 259; W. LaFave, *Search and Seizure,* § 11.4, p. 624 (1978).

We are satisfied that a restrictive formulation of the inevitable discovery exception to the exclusionary rule can overcome these difficulties while enabling the prosecution to proceed as it would have had no illegality occurred. We require the State to show that (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means. *See* W. La-Fave, *Search and Seizure, supra,* § 11.4 p. 626, citing LaCount & Girese, "The Inevitable Discovery Rule, an Evolving Exception to the Constitutional Exclusionary Rule," 40 *Albany L.Rev.* 483, 491 (1976) ("the prosecution 'must establish, first, that certain, proper and predictable investigatory procedures would have been utilized * * * and second, that those procedures would have inevitably resulted in the discovery of the evidence in question' "); *Stokes v. State,* 289 *Md.* 155, 423 *A.*2d 552 (1980) (evidence excluded under this standard when police, after lawful arrest, relied on unlawfully elicited statement by defendant that his heroin was hidden in "drop ceiling").

With respect to the burden of proof, the issue of inevitable discovery does not relate to an element of the crime of which defendant is accused. For that reason we do not believe that the "beyond a reasonable doubt" standard is necessary or appropriate to protect defendant's rights. A lesser burden of proof is acceptable when the issue is the admissibility of evidence. For example, in determining whether evidence seized pursuant to a warrantless search may be admitted, the State generally bears the burden of showing by a fair preponderance of the evidence that the search was lawful. *State v.*

*Slockbower,* 79 *N.J.* 1, 16 n. 1 (1979); *State v. Whittington,* 142 *N.J.Super.* 45, 51–52 (App.Div.1976). However, although the Supreme Court in *Nix v. Williams, supra,* held the State only to a "preponderance of the evidence" burden in approving the inevitable discovery exception, we are of the view that proof by a mere preponderance is not sufficient. In other instances we have held the State to a higher burden than that minimally required by the federal Constitution according to the Supreme Court. *Compare State v. Kelly,* 61 *N.J.* 283, 294 (1972) (state must prove voluntariness of statements beyond reasonable doubt) *with Lego v. Twomey,* 404 *U.S.* 477, 489, 92 *S.Ct.* 619, 626, 30 *L.Ed.*2d 618, 627 (1972) (prosecution must prove by preponderance of evidence that confession was voluntary; "The States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake."). *See also State v. Gregorio,* 142 *N.J.Super.* 372 (Law Div.1976) ("clear and convincing" burden imposed on State to prove that source of witness is independent of immunized testimony of defendant).

In a case in which the State seeks to rely on the inevitable discovery exception, it is because the police have already violated the law. Evidence has been obtained unlawfully; a defendant's constitutional rights have been denied. The State itself is directly responsible for the loss of the opportunity lawfully to obtain evidence; the State has created a situation in which it is impossible to be certain as to what would have happened if no illegal conduct had occurred. Moreover, the State itself is in possession of all relevant evidence bearing upon its ability to have otherwise lawfully discovered the evidence. Finally, the defendant is at a gross disadvantage; defendant's constitutional rights were in fact abridged, and, he is in possession of no independent evidence concerning whether the evidence that had been seized unlawfully would have otherwise been discovered through lawful means. Consequently, the State should be required to make a strong showing that, by the admission of the evidence, it is in no better position than it

would have enjoyed had no illegality occurred. We conclude therefore that a "clear and convincing" burden must be imposed on the State. This, we believe, would restore a fair balance between the adversarial positions of the parties and constitute a proper accommodation of the conflicting interests of the State and the defendant. *Accord Matthews v. Eldridge*, 424 *U.S.* 319, 335, 96 *S.Ct.* 893, 903, 47 *L.Ed.*2d 18, 33 (1976) (determination of burden of proof depends on balance of interests); *In re Polk*, 90 *N.J.* 550 (1982) (same).

Thus, the test for the application of the inevitable discovery exception involves the standard we have prescribed and the burden of proof we have imposed. The State must show by clear and convincing evidence that had the illegality not occurred, it would have pursued established investigatory procedures that would have inevitably resulted in the discovery of the controverted evidence, wholly apart from its unlawful acquisition.

We will not speculate in this case as to what proofs the State can marshall to satisfy this standard for inevitable discovery. However, on this record we cannot discount the availability of such evidence even without the use of tainted witnesses and evidence. Appropriate competent testimony could suggest to a trier of fact that it was inevitable that proper, normal, and specific police investigative procedures would have been initiated and pursued and would have led eventually to the discovery of the victim's body, wholly apart from the unlawful means that had been exploited by the police.

 We are satisfied that the inevitable discovery exception and its applicability to the facts in this case should be reconsidered. Consequently, the remand of this matter will include the opportunity for the State to present its position on the motion to suppress evidence from the search of August 6th.[3]

---

[3]Although we recognize the availability of the inevitable discovery exception under narrow circumstances, when the illegality that gives rise to the claim of

## IV.

Defendant also raises several other claims. One relates to the admissibility of the purchase by defendant of assertedly lethal drugs. Another claim concerns the forensic use of this evidence in the experts' opinions as to the victim's cause of death. An additional contention challenges the constitutionality of closing the taint and suppression hearings to the public. We find insufficient merit in these claims to constitute additional grounds for reversal.

### A.

The State first learned of the purchase of drugs at Newcomb Hospital by defendant through Detectives Tirelli and Walters. Defendant contends that evidence of his drug purchases should not have been admitted because Tirelli and Walters had been participants in the illegal intercept and had overhead defendant tell his attorney Greenblatt about the drug purchases.

Although Tirelli had heard about the drug purchases from the monitored conversation, the court admitted the information as having been derived from an independent source. This decision was correct. Two hospital employees had heard a pharmacist at the hospital describe the defendant's drug purchases and they brought this information to Tirelli and Walters, who were at the hospital at that time to view the victim's autopsy. That was the actual basis upon which the police examined the pharmacy records.

---

"inevitable discovery" consists simply of the failure to obtain a search warrant, the exception should not be applied to circumvent the warrant requirement, *see* *Commonwealth v. Benoit*, 382 *Mass.* 210, 415 *N.E.*2d 818 (1981); *United States v. Griffin*, 502 *F.*2d 959 (6th Cir.), *cert.* den., 419 *U.S.* 1050, 95 *S.Ct.* 626, 42 *L.Ed.*2d 645 (1974), or to defeat the deterrent purposes espoused in the exclusionary rule. *See Nix v. Williams, supra,* 467 *U.S.* at ——, 104 *S.Ct.* at 2509, 81 *L.Ed.*2d at 387.

There were sufficient facts of record to establish that the evidence relating to drug purchases by the defendant was derived from a source independent of the information obtained from the illegal intercept. Under these circumstances, this evidence was not derivatively tainted and was permissibly admitted into evidence.

## B.

At the trial a toxicologist and a chemist, retained as experts by the State, testified that as a result of a chemical analysis that had been performed on the deceased's body tissues, fentanyl and dioperiodol, the two constituents of the drug Innovar, had been found in the deceased's body. The two experts expressed their opinions that Innovar poisoning had been the cause of death. The trial court allowed this opinion testimony by the experts despite the State's stipulation that it could not prove that the dose of Innovar administered to Joan Sugar by defendant caused her death. Defendant claims that this testimony should not have been admitted because it was speculative and constituted a lay opinion outside the special knowledge of the experts. The Appellate Division found no merit in this argument. We agree.

The State's expert testimony in this case was entirely proper. It related to the circumstances under which Innovar would be administered. The experts were qualified to evaluate the medical significance of Innovar found in the body, particularly when there are no other traumatic injuries, diseases and other toxic substances present, and it is found in a person who was not hospitalized. The fact that the State did not show how much of the drug had been administered is not dispositive.

Moreover, the ultimate issue of criminal guilt was left for the jury to resolve. The experts' opinion as to the cause of death in this context was not tantamount to the inference that the cause

was criminal. In this case, the jury was still free to believe that defendant either did not know he gave his wife a lethal dosage or that a lesser dosage had an unexpected effect on her physiological system.

We are satisfied that the testimony of the experts relating to the medical significance of the drugs found in the victim's body was properly admitted. It furnishes no basis for a reversal of defendant's conviction.

## C.

Defendant also contends that the trial court improperly and unconstitutionally conducted *in camera* proceedings with respect to the taint and suppression hearings, excluding the press and the public. We can quickly dispose of this contention.

In *Waller v. Georgia*, 467 *U.S.* 39, 104 *S.Ct.* 2210, 81 *L.Ed.* 2d 31 (1984), the Supreme Court held that a defendant has a Sixth Amendment right to open pre-trial suppression hearings. The Court also recognized the public's right of access to such hearings. It laid down a three-pronged test for determining whether a court may properly close pretrial hearings. First, the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; second, the closure must be no broader than necessary to protect that interest; and third, the trial court must consider reasonable alternatives to closing the proceeding and make findings adequate to support the closure.

Defendant also argues that *State v. Williams*, 93 *N.J.* 39 (1983), has not been interpreted to allow the prosecution to move for closure over the objection of the defendant under the State Constitution. The Court, however, recognized the possibility that under proper circumstances the prosecutor or the court itself could move for closure. 93 *N.J.* at 64 n. 8.

In the present case the court satisfied the closure requirements set down in *Waller*, which, we note, are entirely consistent with the standards we adopted in *State v. Williams, supra,* 93 *N.J.* 39, dealing with the public's right of access to pretrial hearings. First, the State had an overriding reason for seeking the closure. This Court in *Sugar I* had previously held that tainted witnesses and evidence must be excluded from any further prosecution of defendant. If the taint and suppression hearings were held in public, there was a real danger that the hearings themselves would contribute more taint and jeopardize the continued availability of untainted witnesses. Second, the court examined all reasonable alternatives to closure and sought advice from both counsel but could develop no adequate substitute. Third, the closure was as limited as it could have been under the circumstances.

Accordingly, we find no procedural or constitutional error in the decision to close these hearings.

## V.

In conclusion, we reaffirm our ruling in *Sugar I* that the police misconduct that occurred in the course of the investigation of this case resulted in a grave violation of a defendant's constitutional rights to counsel. These unlawful acts were repugnant to public policy, outrageous in their arrogant disregard of elementary constitutional standards to safeguard the rights of a person accused of crime, and intolerable in their gross disrespect for the integrity of the judicial system.

For these reasons, an extraordinary remedy must be fashioned. We see no alternative to a bar against the State in the prosecution of the defendant from the use and participation of any person who actually engaged in, or had direct knowledge of, the illegal intercept. These persons must be deemed tainted in a primary sense. Moreover, the State cannot use any witnesses or introduce any evidence that has been derivatively or

indirectly tainted as a result of the dissemination or exploitation of the information obtained by the illegal intercept if it is not feasible or possible for such witnesses or evidence to be presented free from such taint. Accordingly, the defendant's conviction of murder in the second degree must be reversed.[4]

The matter is remanded. If the State decides to proceed with its prosecution, it will devolve upon the trial court to assure that witnesses and evidence presented in support of the prosecution are not tainted in either a primary or derivative sense. As to the latter, the trial court may rely on the record developed in the prior taint hearings, as well as conducting additional hearings. The trial court may also conduct further hearings on whether any evidence derived from the search of defendant's premises on August 6th should be admitted under the inevitable discovery exception to the exclusionary rule.

The judgment of conviction is reversed; the matter is remanded for further proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and SCHREIBER—7.

*For affirmance*—None.

---

[4]In this appeal defendant did not seek a dismissal of the indictment and that issue is not before us. If it appears that Mazzeo testified before the grand jury, the defendant should be given the opportunity on remand to have the indictment dismissed. That would be consistent with our decision in *Sugar I* and would reflect an appropriate exercise of the authority that is inherent in the Court's constitutional judicial powers. See *State v. Abbati*, 99 *N.J.* 418 (1985). However, as in *Sugar I*, we do not believe under such circumstances that a final dismissal of the criminal charges would be required. We are unable to conclude from the record that the State would not have sufficient evidence available to it in terms of the testimony of witnesses and other evidence that still remains unsullied by the constitutional violations that occurred. If it does, it may proceed anew in its attempt to prosecute the defendant.