968 A.2d 715 (2009)
406 N.J. Super. 510
STATE of New Jersey, Plaintiff-Respondent,
v.
Ross FINESMITH, Defendant-Appellant.
DOCKET NO. A-1056-08T4.
Superior Court of New Jersey, Appellate Division.
Argued January 27, 2009.
Decided April 21, 2009.
*717 Paul B. Brickfield, River Edge, argued the cause for appellant (Brickfield & Donahue and Fox Rothschild, L.L.P., attorneys; Mr. Brickfield and Alain Leibman, Lawrenceville, of counsel and on the briefs).
Jeanne Screen, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Ms. Screen, of counsel and on the brief).
Before Judges SKILLMAN, GRAVES and GRALL.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
The most significant issue presented by this appeal is whether police officers executing a search warrant may re-enter the premises the warrant authorizes them to search if the officers are unable to locate an item of evidence specified in the warrant during their initial entry. The federal courts have recognized that such a re-entry is appropriate in limited circumstances under what is known as the "reasonable continuation doctrine." Applying this doctrine, we conclude that the trial court correctly ruled that the re-entry into defendant's residence that revealed incriminating evidencespecifically a computer containing evidence of child pornography was a reasonable continuation of the search authorized by a warrant even though there was a two-hour interval between the end of the first entry into the residence and the re-entry to complete the search. We also conclude that the trial court correctly ruled that the search for and seizure of the computer were valid even though the police officers determined its precise location from a suppressed statement by defendant, because the officers inevitably would have discovered the computer even if defendant had not told them its location.

I.
On July 14, 2005, defendant Dr. Ross Finesmith was indicted for second-degree endangering the welfare of a child based on his alleged distribution of child pornography from a computer in his home and fourth-degree endangering the welfare of a child based on his alleged possession of child pornography on his computers. A substantial part of the State's evidence against defendant was obtained in a search of his residence pursuant to a search warrant that resulted in the seizure of computers containing pornographic videos of children. During the search and following his arrest, defendant made certain inculpatory statements.
Before trial, defendant filed a motion to suppress a computer found in his van parked in the garage of his residence and his inculpatory statements. The trial court denied defendant's motion to suppress the computer but granted the motion to suppress his statements except for statements made immediately after the police entered his house to execute the warrant.
We granted defendant's motion for leave to appeal from the order denying his motion to suppress the computer.[1] The State did not seek leave to cross-appeal from the *718 order that suppressed defendant's inculpatory statements.
The search of defendant's residence was based on information provided to the New Jersey State Police by the Wyoming Internet Crimes Against Children Task Force that certain Internet Protocol ("IP") addresses located in New Jersey had been making pornographic videos involving children available through peer-to-peer file-sharing networks. One of the officers who conducted the search, Detective John Gorman of the State Police Digital Technology Investigations Unit, explained that if a person has computer files he wants to share, he can download a program that will connect him to a peer-to-peer network and place those files in a folder on his computer. The files will then be available for downloading by anyone anywhere in the world.
Based on the information provided by the Wyoming Task Force, the registration to defendant's wife, Leslie Finesmith, of one of the IP addresses disclosed by the Wyoming search, and surveillance of the Finesmith residence, the State Police obtained a warrant on January 21, 2005 to search that residence for computers, pornographic videos involving children and other related materials. The police were authorized to execute the warrant within ten days of its issuance between 5:00 a.m. and 11:00 p.m.
At approximately 5:45 a.m. on January 27, 2005, Detective Gorman, accompanied by seven other officers representing the State Police, local police departments and the FBI, went to defendant's residence to execute the warrant. The police knocked on the front door and rang the door bell, and after a few minutes, defendant opened the door. Defendant's wife and daughters were awoken shortly thereafter and brought downstairs. The police informed defendant that they were investigating pornographic videos involving children and would be searching the house for evidence of those videos.
Detective Gorman asked defendant how many computers were in the house. He responded that there were five, two in his daughters' upstairs bedrooms, two on the first floor and one in the basement.
Detective Gorman also asked Mrs. Finesmith about the locations of computers in the house. She told him that in addition to the five computers mentioned by defendant, he also had a laptop computer he transported back and forth between his office and home and that he would sometimes plug this computer into the Internet from home. Mrs. Finesmith told Detective Gorman she did not know the current location of the laptop.
After Detective Gorman finished speaking with Mrs. Finesmith, he walked downstairs to speak with another member of the search team who was conducting a "forensic preview" of the computer located in the basement. Such a preview enables the police to conduct a cursory search that will reveal any "media on that computer such as video files or pictures." The forensic preview of the basement computer revealed one video called "Baby J. Flower" and another called "Baby Shivid," which were videos of an adult male having sex with a prepubescent female. These were the same titles as the files tracked by the Wyoming investigators to defendant's residence.
Upon receiving this information, Detective Gorman returned upstairs and asked defendant who used the computer in the basement. Defendant responded that he was the one who used that computer and that it rarely would be used by anyone else. Detective Gorman then administered Miranda warnings to defendant.
*719 Thereafter, Detective Gorman asked defendant about the laptop computer Mrs. Finesmith had mentioned. According to Gorman: "[This computer] was critical to the investigation at that point. We had another computer that was not accounted for, another article of evidence that we knew existed but it was not accounted for, so I needed to know where that was." In response to Gorman's inquiry, defendant stated the laptop was "at his office."
Shortly thereafter, Detective Gorman placed defendant under arrest for possession and distribution of child pornography and transported him to police headquarters. A number of other members of the search team stayed in the Finesmith residence to continue the search.
After defendant's arrest, his family retained an attorney, Alain Leibman, to represent him. According to Leibman, he spoke to Detective Gorman by telephone around 9:20 a.m. Leibman told Gorman that he represented defendant and that all questioning of defendant should cease. Gorman told Leibman there was no questioning being conducted. Gorman also told Leibman that defendant would be released on his own recognizance. Reassured that he did not need to give immediate attention to defendant's case, Leibman did not go to the police headquarters where defendant was being held.
Around the same time as Leibman's call, Detective Gorman readministered Miranda warnings to defendant and again asked him about the location of the laptop computer. Defendant told Gorman a second time that the laptop was in his medical office. Gorman then sent another member of the search team, Detective Robert Herzog of the Roxbury Police Department, to defendant's office to get the laptop. However, Herzog reported back to Gorman that he had been unable to locate the laptop. When Gorman told defendant the laptop could not be found in his office, defendant "responded by telling [Gorman] I forgot. It's at home in my van." By this time, the other members of the search team who had remained in the Finesmith residence when defendant was arrested had left.
Detective Gorman was uncertain whether the search warrant provided the requisite authorization for the search team to return to the Finesmith residence to search defendant's van for the laptop. Consequently, he "decided to err on the side of caution" and asked defendant whether he would sign a "State Police Consent Form" that would authorize the search team to seize the laptop. Although defendant initially expressed reluctance to sign this form without consulting an attorney, he eventually signed it at approximately 10:48 a.m.
Detective Herzog returned to the Finesmith house, where he found and seized the laptop computer on the floor in the backseat of defendant's minivan in his garage.
Defendant testified that when Detective Gorman first administered Miranda warnings regarding his right to an attorney, he responded, "Can I see one?" and Gorman then stated: "If you sign here, you still have a right to see an attorney throughout the remainder of the day." Defendant also testified that when Gorman continued questioning him, he responded: "I don't have anything else to say to you. You are asking me the same questions. I don't know what else to say. I'm telling you everything that I could. I don't want to speak to you anymore." Shortly thereafter, Gorman told him he was going to be arrested.
The trial court ruled that all of defendant's statements after Detective Gorman informed him that the preview of the basement computer had revealed child pornography *720 and began questioning him about who used the computer were made in response to custodial interrogation, and because defendant told Gorman he was the primary user of the basement computer before Gorman administered Miranda warnings, this admission had to be suppressed. The court also credited defendant's testimony that after Gorman administered Miranda warnings including his right to an attorney, he asked, "Can I see one?" and concluded that this response constituted an invocation of defendant's right to counsel. Consequently, the court suppressed all of defendant's inculpatory statements made after that time.
In addition, the court credited Leibman's testimony that he told Gorman around 9:20 a.m. that he was representing defendant and that any questioning of defendant should stop. The court found that Gorman failed to inform defendant of Leibman's telephone call until many hours later. Based on these findings, the court ruled that any subsequent waiver of defendant's privilege against self-incrimination was invalid. The court also ruled that because Detective Gorman had failed to honor defendant's request for counsel and failed to inform him of his family's retention of Leibman, defendant's consent to the search of his van for the laptop was invalid.
Nevertheless, the court concluded that the search warrant provided the requisite authorization for the police to re-enter defendant's residence to continue the search for the laptop. The court also concluded that even though defendant's statement to Gorman that the laptop must be in his van because it had not been found in his office was obtained by improper police questioning and therefore should be suppressed, the return to defendant's residence to continue the search for the laptop was valid under the inevitable discovery rule. In reaching this conclusion, the court stated:
[I]t's obvious from the actions of the police that the search for the laptop never really stopped. That the reentry to the home was a continuation of the original search. The police were led away from the home and further search of the home because of some misstatements that were offered by the Defendant as to the laptop being in his Morristown office.
....
The search warrant is specific for computers and electronic devices that could be used to download and share child pornography. Had the laptop not been discovered at the home by comments coming from the Defendant, there's little doubt that the investigation would have continued until that laptop was recovered. At the end of the first search, it was not only known that the laptop existed, but also that it was used primarily by the Defendant.
Child pornography had already been found on the basement computer. It's apparent to me that the police would have continued in searching for the laptop. The exclusionary rule is meant to [e]nsure that the State does not profit from illegal activity by the police. However, the rule is not so broad as to make the State worse off than if the illegal activity had not occurred.
....
It's clear to me that the police knowing the nature of the case, knowing that they had child pornography in the basement, knowing that the laptop existed, knowing that the Defendant used that same laptop to plug into the home system, they would have continued. The discovery is inevitable.
On appeal, defendant argues that the search warrant did not authorize the police *721 to re-enter his residence to continue the search for the laptop. Defendant also argues that the trial court erred in concluding that this search was valid under the inevitable discovery rule even though his statement that the laptop was in his van in the garage had been suppressed. We reject both arguments and affirm the denial of defendant's motion to suppress the laptop.

II.
Our courts have not previously had occasion to consider whether a single search warrant may provide authorization for the executing officers to make more than one entry into the premises identified in the warrant if they are unable to locate an item of evidence specified in the warrant during their initial entry. However, the federal courts have adopted what is commonly referred to as the "reasonable continuation doctrine" under which police may in some circumstances temporarily suspend a search authorized by a warrant and re-enter the premises at a later time to continue the search. See, e.g., United States v. Keszthelyi, 308 F.3d 557, 568-69 (6th Cir.2002); United States v. Squillacote, 221 F.3d 542, 557-58 (4th Cir.2000), cert. denied, 532 U.S. 971, 121 S.Ct. 1601, 149 L.Ed.2d 468 (2001); United States v. Gerber, 994 F.2d 1556, 1558-61 (11th Cir. 1993); United States v. Kaplan, 895 F.2d 618, 623 (9th Cir.1990); United States v. Carter, 854 F.2d 1102, 1107 (8th Cir.1988); United States v. Bowling, 351 F.2d 236, 241 (6th Cir.1965); United States v. Joseph, 278 F.2d 504, 505 (3rd Cir.1960).
In order for a re-entry into premises to be considered a reasonable continuation of the search authorized by the warrant, two conditions must be satisfied: first, "the subsequent entry must ... be a continuation of the original search, rather than a new and separate search," and second, "the decision to conduct a second entry to continue the search must be reasonable under the totality of the circumstances." Keszthelyi, supra, 308 F.3d at 569.
The application of the reasonable continuation doctrine is illustrated by Kaplan, which involved the execution of a search warrant for files located in a doctor's medical office. 895 F.2d at 623. After the officers executing the warrant determined that they had not been given all the files identified in the warrant in their initial entry into the office, they returned two hours later to obtain the remaining files. Ibid. In upholding the validity of the second entry under the reasonable continuation doctrine, the court stated:
[T]he entry and search two hours later for files listed on the search warrant renders the second entry a continuation of the first. Furthermore, the files obtained were not additional files not known to the magistrate, but were files specifically requested.
[Ibid.]
Another illustration of the application of the reasonable continuation doctrine is provided by United States v. Huslage, 480 F.Supp. 870 (W.D.Pa.1979), which involved the execution of a warrant for the search of a car for various items of evidence of a kidnapping, including a pistol. The police conducted an initial search of the car at 4:10 a.m. using flashlights, but were unable to find any of the evidence identified in the warrant. Id. at 874. Thereafter, the victim reaffirmed that she had seen a pistol in the car used to transport her during the kidnapping. Ibid. The police then returned to the car and, aided by natural light, found the pistol tucked behind a loose piece of upholstery. Ibid. Defendant moved to suppress on the ground that the warrant only authorized a single entry into the car and therefore the officers' second *722 entry that revealed the pistol was invalid. Id. at 874. In rejecting this argument, the court stated:
[T]he fact that the police made two entries into the Volvo pursuant to a single search warrant does not require a finding that the police violated the Fourth Amendment rights of the defendants. The question is not whether the police went through the door of the vehicle twice, but rather, whether the search conducted at 10:00 A.M. was a continuation of the search that had been initiated at 4:10 A.M. ... Inadequate lighting prevented the police from thoroughly searching the vehicle at 4:10 A.M. The scope of the two searches was identical. Probable cause for the search still existed at 10:00 A.M. Trooper Schaffer acted reasonably when he entered the Volvo during daylight to renew his search for the weapon.
[Id. at 875.]
Based on the reasoning of the federal cases applying the reasonable continuation doctrine, the trial court correctly ruled that the warrant for the search of defendant's residence authorized the second entry to continue the search for the laptop computer. The warrant authorized the police to search defendant's residence for "[a]ny and all computers." Thus, the laptop computer was one of the specific objects of the search. Moreover, the warrant identified the premises to be searched as including the "two car garage ... on the right side of home" where the laptop was found. Consequently, it is undisputed that the search which revealed the laptop computer would have been valid if the laptop had been found during the initial entry into defendant's residence. The only question is whether the warrant provided the requisite authorization for the second entry.
During the initial entry, defendant and his wife informed the police of the existence of the laptop computer. They also informed the police that defendant was the one who used this computer and that he carried it back and forth between his residence and office. From this point forward, the laptop computer became one of the primary targets of the search. Thus, it is clear the police would have considered their search of defendant's residence incomplete without finding the laptop and that, but for the fact defendant told Detective Gorman the laptop was in his office, the remaining members of the search team would have continued the search of defendant's residence until they found the laptop. Moreover, once the officers executing the warrant were informed that the laptop was not in defendant's office but rather in his van, they immediately returned to defendant's residence. Only two hours elapsed between the officers leaving the house after the initial entry and returning to complete the search. Under these circumstances, we conclude that the re-entry into defendant's residence by the officers responsible for executing the warrant was "a continuation of the original search, and not a new and separate search," and that it was "reasonable under the totality of the circumstances." Keszthelyi, supra, 308 F.3d at 569. Therefore, it constituted a "reasonable continuation" of the search for computers and pornographic videos involving children authorized by the warrant.

III.
The second question presented by this appeal is whether the laptop computer must be suppressed because the police determined its precise location as a result of a suppressed statement by defendant. The trial court found that the police would have continued their search and discovered the laptop even if defendant had not told them it was located in his van in the *723 garage and that the laptop was therefore admissible under the inevitable discovery exception to the exclusionary rule.
The essential rationale of the inevitable discovery doctrine is that, even though evidence may have been obtained as a result of unlawful governmental activity, if the prosecution can show that "the information ultimately or inevitably would have been discovered by lawful means ... the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 387-88 (1984). Put another way, although the prosecution should not be "put in a better position than it would have been [in] if no illegality had transpired," it also should not be "put in a worse position simply because of some earlier police error or misconduct." State v. Holland, 176 N.J. 344, 361, 823 A.2d 38 (2003) (quoting 5 Wayne R. LaFave, Search & Seizure, § 11.4(a) at 244 (3d ed. 1996)).
To justify the admission of evidence under the form of the inevitable discovery doctrine adopted by our Supreme Court based upon its interpretation of the New Jersey Constitution, the State must show, by "clear and convincing" evidence, that "(1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means." State v. Sugar, 100 N.J. 214, 238-40, 495 A.2d 90 (1985) (Sugar II). However, the State is not required to show the precise circumstances under which the evidence would have been discovered:
To establish the inevitability of discovery of evidence, the State need not demonstrate the exact circumstances of the evidence's discovery. It need not establish the exclusive path leading to the discovery.... It may [satisfy its burden] by demonstrating that such discovery would occur in one or in several ways. A number of possibilities may cumulatively constitute clear and convincing evidence that the evidence would be discovered.
[State v. Sugar, 108 N.J. 151, 158-59, 527 A.2d 1377 (1987) (Sugar III).]
Detective Gorman gave the following description of the investigatory procedures that would have been used to complete the search of defendant's residence even if defendant had not told him the laptop computer was probably in his van:
Q. What specific steps would you have taken to find, if any, to find that laptop if the defendant had not told you that it was in the car in the garage of his house?
A. At that point I realized that laptop was a critical piece of evidence in this case. Had it not beenit was not I initially where the defendant said it was, and had he not told me where it was from there, we would have taken any necessary steps to locate that laptop. I would have advised everyone on the search [team] that there was a missing piece of evidence, there is something that we missed, most likely at the house. We would have to revisit that. We would have to go back into that house and search the house.
At the time of the search warrant, I had no reason not to believe Mr. Finesmith when he said that it was at his office. Now, different situation. There's a critical piece of evidence, most *724 likely at that house. We need to revisit the house.
The trial court found based on this testimony and the other evidence presented at the hearing on defendant's motion to suppress that the police determined shortly after they first entered the residence that "the laptop existed" and that "it was used primarily by the Defendant" but that they "were led away from the home because of some misstatements that were offered by the Defendant as to the laptop being in his [medical] office." The court also found that even if defendant had not told Gorman about the location of the laptop, "there's little doubt that the investigation would have continued until that laptop was recovered." In addition, although not specifically found by the trial court, it is evident from the testimony of Detective Herzog that the laptop was located in a conspicuous place on the floor of the car where it would have been discovered by any officer conducting even a routine search.
Based on these findings, the trial court correctly concluded that the laptop computer was admissible under the inevitable discovery exception to the exclusionary rule even though the police determined its location as a result of a suppressed statement by defendant. The execution of a search warrant is unquestionably a "proper, normal and specific investigatory procedure[ ]." Sugar II, supra, 100 N.J. at 238, 495 A.2d 90. Moreover, the court's finding that the search pursuant to that warrant would have been continued until the laptop was discovered, regardless of what defendant told the police about its location, is supported by sufficient credible evidence, in particular Detective Gorman's testimony. See State v. Locurto, 157 N.J. 463, 474-75, 724 A.2d 234 (1999). The court's further finding that the search "would have inevitably resulted in the discovery of the [laptop] ... wholly independent[ ] of [defendant's suppressed statements]" is also adequately supported by the record. Sugar II, 100 N.J. at 238, 495 A.2d 90. Therefore, the trial court properly denied defendant's motion to suppress evidence of the laptop.
Affirmed.
NOTES
[1] We also granted a motion by the State for leave to appeal from an order that placed time limits on a "Communications Data Warrant." That appeal is still pending.