# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2582-17T2

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

KERI J. BARRY,

    Defendant-Respondent.

_____

> Submitted November 15, 2018 – Decided July 19, 2019
>
> Before Judges O'Connor and DeAlmeida.
>
> On appeal from interlocutory orders of the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 11-04-0406.
>
> Camelia M. Valdes, Passaic County Prosecutor, attorney for appellant (Christopher W. Hsieh, Chief Assistant Prosecutor, of counsel and on the brief).
>
> Bruno & Ferraro, attorneys for respondent (Kenneth M. Ralph, of counsel and on the brief).

PER CURIAM

By leave granted, plaintiff State of New Jersey appeals from the January 31, 2018 and February 1, 2018 orders of the Law Division suppressing evidence, including the body of a dead newborn, found by police in defendant Keri J. Barry's home. We affirm.

I.

According to a statement given to police by defendant, on December 11, 2009, she, then twenty-two years old, gave birth to a full-term, 7.8-pound baby boy, in a bathroom in the basement of her family home in Wayne. After giving birth, she placed the child in a garbage bag along with bloody towels and left the bag on the bathroom floor. Defendant thereafter placed the placenta in a small plastic bag, knotted the top, and left it on the bathroom floor.

A short time later, when defendant's fifteen-year-old sister arrived home from school, she found defendant upstairs in the bathtub bleeding. The sister summoned her aunt, who came to the home and took defendant to the emergency department of a local hospital. Defendant was admitted to the facility with abdominal pain and symptoms consistent with recent childbirth or miscarriage. She told the medical personnel treating her that she had not been pregnant and did not have a miscarriage.

A-2582-17T2

Defendant's father subsequently arrived at the hospital. The father testified that based on defendant's representations, he believed his daughter's condition was caused by a cyst or something cancerous. He returned home later that evening and went to the basement bathroom, where he saw blood, but did not disturb or clean anything.

The following day while at the hospital, defendant told her father that something had come out of her body while she was in the basement and that the object was at home in the bathroom in a plastic supermarket bag. The father told hospital staff that he intended to go home and bring the item back to the hospital because he thought an examination of the object would help physicians "detect if it's cancerous or not[.]"

Defendant's father went to the family home and located several bloody plastic bags in the basement. He cut open a bag he thought contained the object that came out of his daughter's body based on the weight and consistency of the bag's contents. Defendant's father saw what he described as a "purplish . . . body part[,]" which he thought might be a kidney in the bag. He transferred the object to another container for transport to the hospital.

Defendant's father also noticed several other bloody kitchen-sized garbage bags in the basement. He collected the bags and put them into a large black

plastic garbage bag. He also gathered bloody towels and placed them into the same large black plastic garbage bag before directing defendant's sister to empty the cat's litter box into the bag. The father placed the large black plastic garbage bag in an outdoor shed to await garbage collection. He returned to the hospital with the container in which he had placed what he thought was a body part. Physicians confirmed the object was full-term human placenta, from which the umbilical cord had been severed.

In light of his examination of defendant and the placenta, a physician concluded it was likely defendant carried and delivered a full-term baby shortly before arriving at the hospital. When confronted with this diagnosis, defendant again denied that she had been pregnant or delivered a baby.

A nurse contacted the Wayne Police Department to report that medical staff believed defendant may have given birth to a full-term child and that the newborn was missing. Sergeant Alfonse Strumolo and two other officers were immediately dispatched to defendant's home to conduct a welfare check, looking for a missing newborn. Strumolo spoke with Corporal Kevin Kearny by telephone. Believing that criminal activity may have taken place at the home, Strumolo stated, "I think we should secure this house. I think we should go in

and get a search warrant for the house." However, neither he nor other members of the police department sought to obtain a search warrant.

Defendant's teenage sister, who was home alone, allowed Strumolo and the other officers into the house. The officers interviewed the teenager about defendant's medical condition and searched several parts of the home, including the kitchen garbage. The officers did not contact the teenager's parents to request permission to interview her or enter the home. The officers found no sign of a newborn. Despite the fact the search failed to yield any evidence, Strumolo remained concerned that a crime may have been committed at the home and believed his supervisors would obtain a search warrant for the house. He therefore posted an officer outside the residence.

Detective Sergeant John Loertscher was the on-call detective that evening. He was contacted and responded first to headquarters and then to the hospital. According to Loertscher, when he arrived at the hospital he was under the belief that he was there to investigate "a miscarriage." He interviewed defendant, her parents, and the medical staff.

Defendant's father informed Loertscher that he had removed bloody towels from the basement and placed them in a large plastic garbage bag, which he put in the shed behind the house. Loertscher responded, "I wanna go get that

. . . you have the bag?" In a written report, Loertscher stated, "I asked if I could secure the bag and he -- meaning Mr. Barry -- said fine, but be careful, it's heavy." Defendant's father offered to go with Loertscher to the house to get the bag, but Loertscher refused and said "[n]o, no, no, I'll just get the bag, and that'll be fine."

Defendant's father was not informed that the police were conducting a criminal investigation or that the plastic bag in the shed may contain evidence that could be used against defendant in a criminal proceeding. He was not advised verbally or in writing of any of the constitutional rights he had with respect to the search of his property, including the right to refuse to consent to a search, to be present during the search, or to withdraw his consent at any time after it had been given. Nor was defendant, who was present at the hospital, advised that she was under investigation for suspected criminal activity. She was not informed of her constitutional rights with respect to the search of her home or the basement, where her bedroom and bathroom were located.

Defendant's father testified that had he been informed that a criminal investigation was under way, he would not have consented to Loertscher examining or retrieving the garbage bag. In addition, he testified that he

consented only to Loertscher examining the plastic bag at the house and not to taking the bag and its contents to the police department.

After leaving the Barry residence, Strumolo returned to police headquarters. Meanwhile, Loertscher had returned from the hospital and was sitting in his office. When Strumolo recommended they obtain a search warrant for the Barry home, Loertscher responded, "No. I got this."

That evening, Loertscher arrived at the Barry residence, secured the large plastic garbage bag in the shed and took it to the Wayne Police Department. The bag was heavy, requiring Loertscher to obtain the help from another officer to move the bag to his vehicle. Loertscher placed the bag in an evidence shed located outside of the station. He did not open the bag that night.

Later that evening, Strumolo, off duty, but preoccupied with his concern that a newborn child had been murdered or was missing and aware that a bag of potential evidence had been retrieved from the Barry house, returned to police headquarters. He found Loertscher in his office. He confronted Loertscher with his concerns about the investigation. Loertscher responded that "it was just a miscarriage." Strumolo, who had not seen the size of the plastic bag retrieved from the house, deferred to Loertscher's assessment, but retained reservations, concerned that the bag may have contained a deceased newborn.

 A-2582-17T2

Loertscher informed two supervisors that the plastic bag had been seized from the Barry home, placed in the department's evidence shed, and not searched. A third supervisor was also aware that the bag was in the evidence shed. No officer examined the contents of the bag.

The following day, December 13, 2009, Loertscher was not on duty. No one searched the bag.

On December 14, 2009, Loertscher was briefly at police headquarters, but attended a retirement seminar. He did not search the bag.

It was not until December 15, 2009, three days after the plastic bag was removed from the Barry residence, that Loertscher removed the bag from the evidence shed and opened it. The search revealed the naked, deceased body of a newborn boy. Following the discovery of the body, the Medical Examiner's office searched the bag more thoroughly and conducted an autopsy, which revealed that the child was born alive, full term, and died of asphyxia caused by suffocation.

By the time the plastic bag was searched, defendant had been released from the hospital and returned home. The following day, detectives took her to the prosecutor's office to interrogate her. During her interview, defendant eventually admitted she was aware she gave birth to a live baby and that she saw

the newborn's lips move. She stated that the child stopped breathing on its own, after which she put the baby in a plastic bag because she could not look at it anymore. Defendant signed a consent to search form, granting police permission to enter her home and seize: (1) a laptop computer from the living room; (2) pregnancy tests in her bedroom closet; and, (3) "any other items relating to this investigation."

During the interrogation, detectives learned that defendant's family had obtained an attorney for her. They terminated the interview and formally arrested defendant. The consent search of the Barry home, however, proceeded. Defendant's father, having been informed that defendant signed a consent form, accompanied detectives to the house. There, detectives found both the laptop computer and a pregnancy test kit. The trial court later issued a warrant permitting a forensic examination of the computer.

A grand jury subsequently issued an indictment charging defendant with: first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (2); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a), N.J.S.A. 9:6-1, and N.J.S.A. 9:6-3; and third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1).

Defendant moved to suppress the evidence obtained from the warrantless seizure of the plastic bag and the contents of the computer. She argued that

police obtained the evidence without having obtained valid consent. The State argued that the evidence was obtained under the consent exception to the warrant requirement and that if consent was not validly obtained, the contents of the plastic bag are admissible under the inevitable discovery doctrine.[1]

Both Strumolo and Loertscher testified at the suppression hearing. Strumolo described the investigation as "botched." Loertscher acknowledged that "mistakes were made" during the investigation. He conceded that he should have recognized the possibility that defendant had not suffered a miscarriage, that the "house should have been secured and a search warrant obtained[,]" and the shed on the Barry property should have been treated similarly. He testified that were he to conduct the investigation again, he would have had defendant's father sign a written consent form. He admitted he conducted the investigation

---

[1] There were a number of other pre-trial motions in this matter. The trial court entered orders admitting defendant's videotaped statement to police, text message conversations with a friend in 2009, text message conversations with the same friend in 2012, and internet searches. We granted the State's motion for leave to appeal the admission of the 2012 text message conversations. In 2015, we reversed the decision admitting those conversations.

in a manner that created a substantial risk that the State's ability to prosecute criminal charges would be compromised.[2]

The trial court also heard testimony from a detective from the prosecutor's office, Kearny, and defendant's father. The videotaped statement of defendant's father was admitted into evidence.[3]

After the hearing, the trial court issued two opinions granting defendant's motion to suppress. With respect to the plastic bag containing the deceased child, the court, relying primarily on the testimony and its credibility determinations of Strumolo and Loertscher, held that the consent exception to the warrant requirement did not apply. The court determined that Loertscher lacked credibility due to his "demeanor and tone of voice," and that his claim he did not suspect anything criminal may have taken place at the Barry house when

---

[2] Immediately after discovery of the deceased child, supervisors removed Loertscher from the investigation. Later that week, he retired, a decision he attributed in part to his mishandling this case. In January 2010, departmental charges were brought against Loertscher for "neglect of duty."

[3] The hearing was delayed when defendant's father invoked his Fifth Amendment privilege after being called as a witness by the State. U.S. Const. amend. V. The trial court relieved the father from testifying. The State moved for leave to appeal from the trial court's decision. We denied the motion. The State thereafter sought from the Office of the Attorney General an immunity petition on behalf of defendant's father. The immunity petition was granted and the hearing recommenced.

A-2582-17T2

he obtained permission to retrieve the plastic bag was not reasonable. The court concluded Loertscher's "opinions, conclusions and investigation defy logic, reason and objectivity," and any reasonable officer would have suspected the possibility that defendant may have engaged in criminal activity based on the information transmitted to police by medical personnel. The court concluded that defendant's father's consent was not validly obtained because he was not informed that the contents of the plastic bag could be used against defendant in a criminal proceeding.

In addition, the court concluded that because defendant's father did not initiate the conversation about retrieving the plastic bag and was not permitted to accompany Loertscher when he retrieved the bag, his consent was not valid. The court found credible the father's testimony that he did not know he could refuse the search, demand to be present for the search, or stop the search at any time. Therefore, the trial court held that the State failed to prove beyond a reasonable doubt that defendant's father gave knowing and intelligent consent.[4] The court also determined that even assuming Loertscher obtained a valid

---

[4] The court later corrected its opinion to reflect that the proper standard is by a preponderance of the evidence, not beyond a reasonable doubt.

consent to retrieve the plastic bag, the three-day delay in opening the bag created a "continuing warrantless search" under State v. Sugar, 100 N.J. 214 (1985).

Concerning defendant's computer, the court held defendant's consent to search the house was invalidated when her father indicated the family had retained an attorney to represent her. The court also found that the consent to search form was deficient because it did not contain language "indicating that defendant may be present and may stop the search and any time" and that the "handwritten language . . . authorizing the Prosecutor's Office [to] take . . . '[a]ny other items relating to this investigation,' is simply overbroad."

The trial court rejected the State's argument that the contents of the plastic bag are admissible under the inevitable discovery doctrine. The court concluded that the doctrine does not apply because the only possible way that the evidence would have been obtained by the State was by securing a search warrant, which the officers specifically decided not to do.

The trial court entered orders on January 31, 2018 and February 1, 2018, granting defendant's motion to suppress the contents of the plastic bag and her computer. We thereafter granted the State's motion for leave to appeal the January 31, 2018 and February 1, 2018 orders, and stayed the trial pending disposition of the appeal.

II.

On appeal, the State makes the following arguments for our consideration:

POINT I

THE MOTION JUDGE MISUNDERSTOOD THE LAW REGARDING CONSENT SEARCHES AND FAILED TO CONSIDER THE DEFENDANT'S FATHER'S COOPERATIVE POSTURE IN PROVIDING HOSPITAL OFFICIALS WITH THE PLACENTA; IN TELLING THE POLICE ABOUT A GARBAGE BAG CONTAINING BLOODY TOWELS AND OTHER ITEMS HE CLEANED FROM THE SCENE; IN GRANTING PERMISSION FOR THE POLICE TO GET THE GARBAGE BAG FROM HIS SHED; AND IN OFFERING TO HELP GET THE BAG AND GO THROUGH ITS CONTENTS.

A.  The Motion Judge Under-Evaluated Critical Evidence of the Father's Cooperative Posture That Demonstrated Voluntary Consent.

B.  The Motion Judge Misunderstood the Law.

C.  The State v. King Factors Are Indicative of Voluntary Consent.

D.  The Motion Judge Erred in Rejecting the Inevitable Discovery Doctrine As An Alternative Means of Establishing a Valid Exception to the Warrant Requirement.

POINT II

DEFENDANT VOLUNTARILY CONSENTED TO SEIZURE OF THE COMPUTER AND PREGNANCY TESTS AND EXECUTED A WRITTEN CONSENT

14

FORM ACKNOWLEDGING THAT SHE WAS INFORMED OF A RIGHT TO REFUSE.

"[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Elders, 192 N.J. 224, 243 (2007) (quotations omitted). "Deference to those findings is particularly appropriate when the trial court has the 'opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy." State v. Watts, 223 N.J. 503, 516 (2015) (quoting Elders, 192 N.J. at 244). We disregard only those findings that "are clearly mistaken." State v. Hubbard, 222 N.J. 249, 262 (2015).

The Fourth Amendment, and Article I, Paragraph 7 of the New Jersey Constitution, protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585-86 (1980) (quoting United States v. United States Dist. Court, 407 U.S. 297, 313 (1972)). "Under our constitutional jurisprudence, when it is practicable to do so, the police are generally required to secure a warrant before conducting a search" of a residence. State v.

Hathaway, 222 N.J. 453, 468 (2015). "To sustain the validity of a warrantless search, the State must demonstrate that the search fits within an accepted exception to the warrant requirement, one of which is the long-recognized consent-to-search exception." State v. Coles, 218 N.J. 322, 337 (2014).

"Although [New Jersey's] search-and-seizure provision is similar to the Fourth Amendment of the United States Constitution, consent searches under the New Jersey Constitution are afforded a higher level of scrutiny." State v. Carty, 170 N.J. 632, 639 (2002). However, while "[t]he Constitution protects against unreasonable searches and seizures and against coerced waivers of constitutional rights[,] it does not disallow voluntary cooperation with the police." State v. Domicz, 188 N.J. 285, 308-09 (2006).

Our Supreme Court has concluded that under

> Art. I, par. 7 . . . the validity of a consent to a search, even in a non-custodial situation, must be measured in terms of waiver; i.e., where the State seeks to justify a search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent.
>
> [State v. Johnson, 68 N.J. 349, 353-54 (1975).]

In non-custodial situations, "if the State seeks to rely on consent as the basis for a search, it has the burden of demonstrating knowledge on the part of the person

16

involved that he had a choice in the matter." Id. at 354; see State v. Koedatich, 112 N.J. 225, 262 (1988). Therefore, "[t]he police need not necessarily advise the person of the right to refuse, as long as the State can prove the person was aware of this right." Hornberger v. Am. Broad. Cos., Inc., 351 N.J. Super. 577, 600 (App. Div. 2002).

"A consent sufficient to avoid the necessity of a warrant may be express or implied from the circumstances." Koedatich, 112 N.J. at 262. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

After a careful review of the record in light of these legal standards we affirm the trial court's conclusion that the State did not obtain valid consent to retrieve the plastic bag from the Barry home. The record amply supports the trial court's determination that Loertscher's contention that he was not conducting a criminal investigation when he obtained consent to retrieve the plastic bag lacked credibility. Loertscher testified that he was under the impression that he was investigating a possible miscarriage. However, in general, evidence a woman has had a miscarriage does not indicate a criminal

act has occurred. The only reasonable explanation for Loertscher's presence at the hospital is that he was investigating whether defendant gave birth and the whereabouts of her newborn child. That scenario gave rise to the possibility of criminal acts by defendant or another person. If, as Loertscher claimed, he was convinced defendant had had a miscarriage, there would have been no reason for him to collect a plastic bag of bloody towels. A police officer has no legitimate interest in evidence that a medical event took place, unless that medical event is related to possible criminal activity.

Loertscher did not inform defendant's father of the ongoing criminal investigation, or any of his constitutional rights with respect to consenting to the search of his home. No evidence was introduced at the hearing establishing that defendant's father was aware of his rights. To the contrary, defendant's father testified that had he known that a criminal investigation was under way and that the contents of the plastic bag might have been used as evidence against his daughter in a criminal proceeding, he would not have consented to the search. The father's testimony is corroborated by his retention of an attorney to represent his daughter as soon as he was informed that she faced criminal prosecution.

We note also that when Loertscher initiated the conversation about retrieving the plastic bag and defendant's father offered to accompany him on

that search, Loertscher affirmatively dissuaded him from doing so, interfering with the father's right to be present and to withdraw consent during the search. Additionally, Loertscher did not seek consent from defendant, who was present at the hospital. The items in the plastic bag, as described by defendant's father, contained her blood and were taken from the area of the home she occupied as her living space. A reasonable officer under these circumstances, as the trial court noted, would have concluded that "a search warrant is necessary or, at a minimum, that a full, complete and unequivocal consent should be obtained."

The trial court's decision is also supported by Loertscher's retention of the unopened plastic bag in the police evidence shed for three days. Our Supreme Court has recognized that "continuing warrantless searches pursuant to an original express consent to search can raise serious constitutional questions concerning the reasonableness of such a subsequent search and seizure." Sugar, 100 N.J. at 234. "The scope of a search extends to what is objectively reasonable, which is defined as what 'the typical reasonable person [would] have understood' the scope to include." State v. Hampton, 333 N.J. Super. 19, 29 (App. Div. 2000) (alteration in original) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)).

During those three days, police could have obtained a search warrant for the contents of the plastic bag, as had been suggested to Loertscher numerous times by Strumolo. We reject the State's argument that the search was valid because defendant's father did not withdraw his consent during the three-day period that the unopened plastic bag was in the shed. This argument overlooks the fact that defendant's father was not informed of his right to withdraw consent. The State cannot benefit from its failure to inform defendant's father of his right to end the purportedly consensual search at any time.

We also agree with the trial court's conclusion that police did not obtain valid consent to seize defendant's computer. Although detectives informed defendant she could refuse to consent, they did not advise her she could withdraw her consent at any time. The failure to inform her of this right was crucial because, after she signed the consent form, but before the conclusion of her interrogation, detectives were informed that defendant's family had retained an attorney to represent her. Although the detectives terminated the interrogation, recognizing that the retention of an attorney effectively withdrew her waiver of her Miranda[5] rights, they permitted the search of her home to proceed. Had defendant been informed that she could withdraw her consent, she

---

[5] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2582-17T2

may well have exercised that right once the interrogation stopped and she was made aware that she was represented by counsel. Nor did the detectives advise defendant that she could be present for the search. While the search took place, defendant was in custody and the police did not transport her to the house before the search commenced.

Finally, we agree with the trial court's conclusion that the plastic bag cannot be admitted pursuant to the inevitable discovery doctrine. The inevitable discovery doctrine is an exception to the exclusionary rule. Nix v. Williams, 467 U.S. 431, 448 (1984). "If the State can show that 'the information ultimately or inevitably would have been discovered by lawful means . . . the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received.'" State v. Maltese, 222 N.J. 525, 551-52 (2015) (alterations in original) (quoting Nix, 467 U.S. at 444).

In order to invoke the doctrine, the State must show by clear and convincing evidence that:

> (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would

A-2582-17T2

have occurred wholly independently of such evidence by unlawful means.

[State v. Keaton, 222 N.J. 438, 451 (2015) (quoting Sugar, 100 N.J. at 238).]

It is an objective standard and is "applied only to the facts known to the law enforcement officer at the time of the search. Facts learned by the authorities after the search and seizure occurs will not validate unreasonable intrusions." State v. Bruzzese, 94 N.J. 210, 221 (1983).

The State must demonstrate that "had the illegality not occurred, it would have pursued established investigatory procedures that would have inevitably resulted in the discovery of the controverted evidence, wholly apart from its unlawful acquisition." Sugar, 100 N.J. at 240. "[T]he central question to be addressed in invoking the 'inevitable discovery' rule is whether that very item of evidence would inevitably have been discovered, not merely whether evidence roughly comparable would have been so discovered." State v. Worthy, 141 N.J. 368, 390 (1995) (quotations omitted). However, "the State need not demonstrate the exact circumstances of the evidence's discovery[.] It need only present facts sufficient to persuade the court, by a clear and convincing standard, that the [evidence] would be discovered." Maltese, 222 N.J. at 552 (second alteration in original) (quoting State v. Sugar, 108 N.J. 151, 158 (1987)).

22

We agree with the trial court's conclusion that "the inevitable discovery doctrine does not apply here because there was no other way other than to get a search warrant to obtain the evidence that was eventually found in this case." The unlawful seizure of the plastic bag, and its retention in police custody over three days before it was searched, occurred because police failed to obtain a search warrant, despite ample opportunity to do so. There is no credible evidence in the record that had Loertscher not obtained invalid consent to seize the bag and held it for three days without obtaining a warrant, that other officers, acting independently of Loertscher, would have secured a warrant to search the shed on the Barry property for the plastic bag. The only reason that police knew that defendant's father had collected potential evidence, placed it into a plastic bag, and stored it in the shed, was Loertscher's interview of defendant's father at the hospital. In addition, the record demonstrates that despite numerous suggestions by Strumolo that a search warrant for the Barry residence be obtained, Loertscher and other police supervisors had no intention of doing so.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION